Deborah J. SCHNEIDER, Plaintiff,

v.

NBC NEWS BUREAUS, INC., a Delaware corporation, National Broadcasting Company, Inc., a Delaware corporation, Don Browne and Tom Wolzien, Defendants.

No. 89–0465 CIV.

United States District Court, S.D. Florida.

Sept. 19, 1991.

Amlong & Amlong, P.A. (Karen C. Amlong, of counsel), Fort Lauderdale, Fla., for plaintiff.

Epstein, Becker & Green, (Sky Smith, of counsel), Miami, Fla., for defendants.

## MEMORANDUM OF DECISION AND ORDER

MISHLER, District Judge.

Deborah J. Schneider claims sex discrimination in her employment at NBC News Bureau, Inc. ("NBC") from July 20, 1981 to August 5, 1988, in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e–2(a). NBC is a wholly owned subsidiary of National Broadcasting Company, Inc. Don Browne was bureau chief of NBC during the subject period; Tom Wolzien was an NBC News Division Vice President.

Schneider claims that (1) she received fewer and less attractive foreign and domestic assignments in her position as a sound technician,[1] and (2) she resigned from her position at NBC because of the sexually hostile atmosphere at NBC's Mia-

---

1. The position is described as Engineer Group II, Utility (audio) Technician.

mi Bureau, which hostile atmosphere was created and maintained by NBC. The issues of fact were tried to the court. The court finds:

NBC hired Schneider on Browne's recommendation on July 20, 1981. She was hired based on her employment application and interview. However, Schneider's application contained false and misleading information.

The application failed to reveal her discharge from the Army and the reasons for her dismissal. The dismissal, dated May 20, 1975, stated that Schneider:

a. Cannot or will not adapt socially or emotionally to military life.

b. Cannot meet minimum standard prescribed for successful completion of training due to deficiencies in attitude, aptitude, motivation or self-discipline.

c. Has demonstrated character and behavior characteristics not compatible with satisfactory continued service.

In her application, she also stated (1) that she attended the University of Iowa for nearly four years from September 1969 to May 1973, whereas she attended the university for only one year, (2) that she was employed at television station WETV at a salary of $695.00 per month, whereas she was not employed at the station, but merely volunteered her services, and (3) that she was employed at television station WAGA in Atlanta, Georgia from September 1976 to March 1980 and left to accept a job offer in Los Angeles, California, whereas she was discharged from her employment at WAGA. In fact, the notice of discharge states, "Ms. Schneider has a history of insubordination and malingering, culminated by failure to report to work without notifying the proper supervisory personnel."

Schneider was aware of her right to be free of sex discrimination in employment, having charged a previous employer, the City of Atlanta, with sex discrimination. Here, she claimed sex discrimination for the first time in January 1988 to Tom Wol-zien, a vice president in the NBC News Division.

In examining Schneider's claims, we first review her history of psychiatric, emotional and physical problems. This is done in order to determine her physical and mental abilities to perform the duties required for her assignments and whether her view of the employment atmosphere is that of a reasonable female employee.

*Psychiatric or Emotional History*

Schneider has a history of emotional illness dating from the early 1970's. From the start of her employment at NBC, Schneider displayed an incompetence and/or a lack of interest in her job in overlooking such routine duties as charging batteries in her equipment and placing tapes for recording sound in a ready position. She soon realized that the crew of which she was a member resented her attitude. This convinced her to obtain the services of Dr. Brian Weiss, Chief of Psychology at Mt. Sinai Hospital in Miami.

These personal emotional problems continued to interfere with her work and staff members complained to Browne. In a meeting with Browne in September 1984, Schneider admitted that her personal problems interfered with the performance of her duties. The problems involved her boyfriend Kelly Rickenbacker and her expectation of entering into a marriage relationship, complicated by her recent adoption of her niece.

On November 12, 1984, Schneider obtained the services of Darlene Stewart, who was supervised by Dr. Kimberly Kidoo. The therapy continued for approximately two years. Stewart evaluated Schneider's emotional state in a report dated July 18, 1985. The report found Schneider to be "stressed," and noted that "Deborah comes in caught up in a negative world of stressful thoughts and feelings. She has no idea how thoughts create personal reality." None of the reports attributed Schneider's emotional upset or psychiatric problems to the work place or the conditions of her employment.[2]

---

2. Ms. Stewart's report of the August 29, 1985 visit states:

Deborah is having trouble in her personal relationships. She wants the man she is liv-

Schneider married Rickenbacker on January 10, 1987. Rickenbacker's place of employment was in Atlanta, Georgia. This separation and the continued emotional turmoil in the relationship with her adopted niece caused "increased irritability and worry, impaired functioning at home (with adopted niece) and at work, inability to control temper and maintain peace of mind in specific situations." (Dr. Kidoo's report of March 19, 1987). Dr. Kidoo restated Schneider's emotional state in a report written after a June 30, 1987 visit. She found that Schneider suffered from:

> [C]ontinued irritability and worry; continued difficulty in controlling temper and effectively disciplining [her] adopted daughter.

*Physical Disabilities*

Schneider's ability to work was also hampered by her physical disabilities. Plaintiff suffered an injury to her right knee on February 4, 1983 when she was struck by a motor vehicle. On her representation that she recovered from the injury and was physically fit for assignment, she was assigned to Managua, Nicaragua in March 1983, and to Costa Rica in April 1983. When she returned, she sought medical treatment and physical therapy without success. However, Schneider insisted she was fit for duty and was assigned to Honduras in June 1983.

Six weeks later, on July 6, 1983, Schneider had surgery on her right knee as a result of residual injuries from her earlier accident. This surgery kept Schneider out of work for approximately three and one-half months. When she returned to work on October 24, 1983, she was placed on light duty and, pursuant to her request, worked as a tape librarian.

Schneider concedes that during 1984 and 1985 she was incapacitated for short periods of time due to her injuries. In February 1985, she developed phlebitis in her left leg and at her physician's request, was placed on light duty.

On January 9, 1986, arthroscopy was performed in an attempt to correct the condi-

tion in her right knee. When that procedure failed she underwent surgery. At Schneider's request, she again was placed on light duty until the end of February 1986. For a few months following the surgery, Schneider underwent physical therapy. After she recovered from the knee surgery, Schneider was assigned to cover riots occurring in Haiti.

*Schneider's Relationship With Members of the Team and Others*

We consider Schneider's claims in light of her relationship with other members of the crews to which she was assigned, along with other employees at the Miami News Bureau of NBC. The Miami News Bureau covered the news for NBC in Central America, South America, the Caribbean and the State of Florida. During the initial period of her employment, the Miami News Bureau was managed by the Bureau Chief, Don Browne. Browne's responsibilities included the hiring of staff, and the assignment of crews to news stories. Later Ike Seamans, as Deputy Bureau Chief and Liz Sintay assumed the responsibility for composing the various members of the crew assigned to news events and the management of the crews. Most of the stories gathered by the crews were produced for television by the Miami Bureau.

A crew consists of a correspondent, producer, cameraperson and sound technicians. The producer has the overall responsibility of gathering the information and determines the manner in which the story or event will be presented on television. The correspondent is the member who is shown describing the scene or event as outlined by the producer. The cameraperson shoots the picture. The sound technician is responsible for clearly recording the sound accompanying the picture for reproduction on television. It is the responsibility of the sound technician to keep the equipment in good working order and to carry it to the spot that will maximize the quality of the recording, i.e., placing the microphone in the most favorable position and angle and keeping the volume

---

ing with to consider marriage and he is un-

willing to do so at this time.

level indicator at a point where the sound will not be too loud or distorted.

The efforts of each member of the crew must be coordinated and each relies on the others to perform their duties competently and efficiently. The cameraperson and sound technicians are in a tandem arrangement where the sound technician's equipment is attached to the camera by an 8 to 10 foot umbilical cable. The cameraperson depends on the reliability, competence and trustworthiness of the sound technician, since taking the picture with the heavy equipment on his right shoulder (35 to 40 pounds) results in a blind spot on the right side.

The competence, reliability, and punctuality of every crew member facilitates a smooth and efficient performance by the crew in order to bring the story or event quickly and clearly to the television viewers.

When Schneider started her employment on July 20, 1981, she joined Joe Valle as the only other sound technician available for assignment. Valle, who was bilingual, was highly qualified through 20 years experience as a sound technician. David Steigelman and Jon Porembski were the only staff camerapersons. In 1983, James K. Nickless was added to the staff as a cameraperson. Bruce D. Bernstein was hired as a sound technician and then was made a cameraperson.

When Browne hired Schneider, he concluded that she "was definitely a network quality person." He based this grading on some familiarity he had in inquiring as to her prior work at a CBS affiliate in Atlanta and listening to a tape she submitted. Her record shows very limited experience as a sound technician. We find she lacked the experience and competence to perform adequately at the outset. Only with years of experience was she able to attain a level of competence that qualified her as a sound technician for events and stories recorded for television. Her incompetence at the beginning alone does not explain the disinclination of members of NBC crews to welcome her in their midst.

At the beginning, Schneider's inexperience and her attitude played a larger role than her emotional problems in causing annoyance and discomfort among the other members of the crew. As time went on, Schneider was able to gain experience as a sound technician. However, her personality, driven by her emotional problems in the form of insubordination, disinterest and carelessness in her job and unreliability in adapting to work played a much greater role in the strained relationship and interpersonal conflicts with members of the crew. We find that were Schneider a male, she would have been discharged for cause long before she left NBC in August 1988. We list some of the incidents in which members of the crew had reason to complain of Schneider's incompetence and disruptive attitude in chronological order, or nearly so.

Steigelman, a cameraperson, after a two month period on assignment with Schneider, in or about August and September 1981, complained that Schneider was argumentative and difficult to work with and that her competence was not of network quality.[3]

In September 1981, Schneider was part of a crew working on a shark research story with NBC's Science Correspondent, Robert Bazell. During the assignment, Schneider had trouble handling the tape machine. She placed the tape machine at the bottom of the boat where salt water had accumulated. Schneider also failed to number the tapes sequentially. In describing her incompetence and behavior, Bazell testified:

> Again, it is a question of attitude. She didn't think it was her job or business to be doing the things that were a sound technician's normal responsibility. [S]he also had a hostile, indifferent reaction to any attempts to try to teach her what to do.

Bazell complained to Browne and suggested that Schneider be fired. Bazell told Browne that plaintiff could be fired "without cause," since she had not yet served her six month probationary period. De-

---

**3.** Steigelman was a sound technician before be- coming a camera person.

spite additional complaints by other members of crews to which Schneider was assigned, Browne refused to fire her, hoping for an improvement in her skill and attitude.

In December 1981, Schneider was part of a crew assigned to interview Muhammad Ali in the Bahamas, publicized as his last fight. Ali suffered from an impairment of speech. The crew's correspondent, Ike Seamans, was attempting to interview Ali along with correspondents from other stations. Sound technicians from the other stations had their microphones positioned at Ali's mouth. Schneider's microphone was hanging over Ali's head. Seamans took the microphone from that position and placed it where Schneider should have had it. The sound of Ali's voice was lost during the time it was held by Schneider over Ali's head.

Steigelman complained to Browne of what occurred at the Ali interview. He also spoke of related instances in which Schneider failed to change the batteries for the sound equipment and put the tapes in a ready position to record. He then asked Browne not to assign both him and Schneider to the same crew.

In June 1983, Schneider was assigned to work in Honduras as part of a crew in which Vic Walter was producer and Jon Porembski was cameraperson. Their purpose was to record the story of a secret training camp where the United States military worked together with the Honduran military to train Salvadoran soldiers. After completing the shoot, the crew was transporting the tape to the airport for a flight in time to show the tape on the Nightly News program. A soldier interrupted their journey to the airport. Walter, through an interpreter, attempted to convince the soldier to let them through. Schneider's loud and uncontrolled dispute over the appropriate route caused the soldier to ignore Walter's plea and he finally hitch-hiked to the airport. Her conduct endangered the safety of the crew.

In 1984, Schneider was assigned to record Gary Hart's presidential campaign, the Democratic National Convention in San Francisco (July 12–20), and the Republican National Convention in Dallas (August 13–24). She and cameraperson Jim Nickless were part of the NBC relief crew. On two occasions when called upon to relieve another member of the camera crew, Schneider could not be found. She had a two-way radio, but did not respond when paged. On an interview with one of the presidential candidates, the sound she recorded was of poor quality because the needle was positioned in an incorrect place, and she failed to notice the defect.

On September 24, 1986, Schneider was assigned with Nickless to work on the Today Show under the supervision of Teri Brito, producer/correspondent. During Ms. Brito's interview of a schoolchild, Schneider repeatedly interrupted Ms. Brito, stating that she was asking the child the wrong questions. On playing the tapes in the studio, Ms. Brito found the quality of the sound to be poor. On another occasion, while Ms. Brito was interviewing a state representative, she told Ms. Brito to "cut" and volunteered that she was addressing the questions incorrectly. Ms. Brito complained to Browne about Schneider's incompetence and unprofessional conduct.

In November 1985, Browne selected Danny Noa as a producer instead of Schneider's then fiance and current husband Kelly Rickenbacker. As a result, Schneider deeply resented Noa. In April 1987, Schneider was assigned to a crew in which Noa was producing a tape of a shooting that had taken place in a mall. Schneider left Noa and accompanied a cameraperson from another television station for about two to three hours. NBC used the tape of a competitor station, WESH, to show the canister of tear gas being launched in the mall to apprehend the "shooter," since Noa was unable to capture the scene due to Schneider's absence.

In November 1987, Schneider was assigned to a crew in which Ms. Brito was awaiting a verdict in a trial of a shopkeeper charged with shooting a burglar in a store. Ms. Brito told Schneider to wait at a specific place in anticipation of the jury announcing the verdict. When the verdict was

announced, Schneider was not waiting at the site that Brito had requested. This caused NBC to lose that footage.

In February 1988, one month after she made her first complaint to NBC (Wolzien) of sex discrimination in her employment, she was assigned to Maria Shriver, who had obtained an exclusive interview with Fidel Castro. The newsworthiness of the interview was enhanced by an exclusive NBC story showing a drug connection between Castro and Manuel Noriega of Panama. NBC planned to show the Castro–Noriega drug footage following Ms. Shriver's interview with Castro, in which it was anticipated that Castro would deny any such dealings. The Castro interview was live. Ms. Shriver rehearsed the form and anticipated the content of the interview during the day. When it went on the air, Schneider pressed the wrong button and a blank screen was broadcast over worldwide television for two or three minutes.

In June 1988, Noa scheduled an interview with a juvenile under detention. The interview had been planned over a period of two weeks. Noa feared that the parents might oppose the interview if the crew arrived late. To insure that the interview would occur on time, Noa contacted Schneider at home to remind her of the importance of arriving on schedule. She failed to arrive at the designated time. Noa, together with the cameraperson assigned, proceeded to set up the equipment and start the interview when Schneider arrived. Schneider's conduct jeopardized the entire interview.

In or prior to July 1988, Noa had scheduled the recording of a scene consisting of a telephone conversation with bank robbers who were in a Mexican bank. He asked Schneider to record the conversation. She was unable to do it. A sound technician with the ordinary skill of a network-level sound technician would have been able to record such a conversation.

Soon thereafter, in July 1988, Noa was assigned to a live shoot for Tom Brokaw. Noa had no faith in Schneider's ability to record a rather complicated event. He

therefore asked Browne not to assign Schneider.

At the same time, Kathy Sulkes, a producer, expressed a similar lack of confidence in Schneider's abilities as a sound technician. Sulkes informed Liz Sintay that Schneider would not be acceptable for her upcoming Central American story. Sulkes explained that in February 1988, she worked on a story with Schneider that was delayed by sound problems caused by Schneider's failure to understand what was wrong with the sound equipment. Since the upcoming assignment required the crew to be out of the country for approximately five straight days, Sulkes asked that someone other than Schneider be assigned to the story.

*Duty in the Tape Library*

Schneider describes her assignment to the tape library as evidence of discrimination based on her sex. After surgery on her right knee on July 6, 1983, Schneider returned to work on October 24, 1983. She was physically unable to perform any field work—foreign or domestic. She requested assignment to the tape library. Before that time no employee was engaged full time in the tape library. Its function was performed by employees who were available at any particular time. Pat Kopco and John Long, editors, among others, responded to the request for tape library duty when called. Schneider might very well have had an editor's position in mind when she made the request, since it was an assignment performed by editors.

At the time Schneider made the request thousands of tapes were filed in the library. There was a need to incorporate the tapes in the library's system for easy reference and access. Browne upgraded her job group from Group 2 (as a sound technician) to Group 6 (an editor's group).

Schneider insists that "she had no physical problem that disabled her from working in the field." (Plaintiff's Post Trial Memo. at 17). We disagree. Schneider stated under oath in her affidavit of January 20, 1984, made in connection with the settlement of a claim concerning her 1983 accident that:

In July of 1983 I had surgery ... [t]o this day my knee is about 70% ... and although it's better there are many things I am restricted in doing ... I am looking for another career that's less demanding on my knee.

When Schneider was able to assume field duties, she was assigned such duties and at the same time continued to perform services in the tape library. It was during this period in 1984, that she was assigned to the Gary Hart campaign and to the Democratic and Republican national conventions.

*Aberrant Behavior*

Schneider engaged in several episodes of unprofessional and irresponsible behavior throughout her tenure at NBC. For example, Schneider's participation in gathering a money laundering story jeopardized NBC's longstanding relationship with the source of the information, i.e., a special agent of the U.S. Customs Service. During the period between September and December of 1985, the special agent gave NBC exclusive information regarding the proceeds of the drug trade in Miami. The money had been hidden in air compressors. Schneider displayed her impatience in complaining to the special agent that dismantling the air compressors in which the money was hidden was taking too long and interfered with her personal matters. The special agent advised NBC of the event and insisted that Schneider not be assigned any further duties in the story.

Schneider also continued to display a hostile attitude toward Dan Noa. In July 1986, Noa was returning from Bolivia to edit a story for NBC Nightly News. He telephoned the Miami Bureau and asked Walker, a producer, to have tapes pulled for his use when he arrived at the office. Walker asked Schneider for the tapes, since she was on duty in the tape library at that time. Her response was, "Danny is a big boy and [can] do it himself."

On August 13, 1986, Schneider took a medical leave of absence for five weeks.[4] She refused to tell Seamans, the Deputy Bureau Chief, the nature of the illness or the anticipated period of absence. Seamans had occasion to call her seeking information relating to the tape library. His efforts went unrewarded.[5]

In February 1988, Schneider was assigned to a shoot with Kathy Sulkes on a golf story concerning one Chi–Chi Rodriguez. The shoot lasted three days during the week in Tampa and was scheduled to resume with plaintiff as the sound technician on Sunday. Schneider had returned to Miami expecting to resume in Tampa on Sunday. NBC decided to hire a free lance sound technician in Tampa and save the expense of travel and overtime. Schneider was advised of the change in plans and was offered an assignment in Miami on Sunday. She refused the Miami assignment.

During her tenure at NBC, Browne granted Schneider the right to use a company car while on company business with the understanding that she was not to use it for personal reasons. On two occasions Browne learned that she was using the car for personal purposes. On one of those occasions, she was involved in an automobile accident.

*Claim of Sexually Hostile Atmosphere*

Schneider claims that the atmosphere at NBC was sexually offensive and intimidat-

---

**4.** The NBC personnel Office in New York granted Schneider's request for medical leave.

**5.** Schneider attributes the need for a medical leave of absence on the claimed hostile work environment. The report from her psychologist, Dr. Kidoo, made in August of 1988, states that Schneider took her leave of absence because she claimed that the stress caused by her work was detrimental and also indicated that Schneider believed that she was being treated unfairly by management. The report concluded that the work related stress resulted from the "virtual cessation of plaintiff's travel after

March 1988." (Plaintiff's Post Trial Memo at 32).

However, Schneider's internist, Dr. Nathan, suspected that the stress was caused by "personal [and] family problems." Schneider also had suffered from emotional problems since the early 1970's and had been receiving regular therapy since 1984 for stress caused by the adoption of her niece and the relationship with her fiance. When Schneider began her medical leave she failed to file a Workers' Compensation Claim, nor was she recommended to do so by her psychologist or internist. We find that the medical leave of absence was not work related.

ing. We find that during the course of her employment, Schneider was in no way offended by the foregoing incidents nor did she at any time view them as sexually offensive. Schneider's allegations of sexual harassment were raised for the first time only months before she resigned from NBC.

As evidence of sexual harassment, Schneider makes reference to the poster, "Miami—See It Like A Native," which was authorized by the Tourism Commission of Dade County and hung in Browne's office by a fellow employee. The poster was of a woman wearing a black bikini, with a bare back to the camera, walking on a beach. About 20,000 posters were distributed to travel agents throughout the country in early 1980. However, a few community groups found the poster offensive and demanded that it be withdrawn. After a public hearing, the commission voted 4 to 2 not to distribute the remaining copies (about 28,000).

Schneider also complained about a Jamaican tourism poster hung outside her office. The poster displayed several women wearing wet T-shirts. Though this poster had been hanging outside Schneider's office since the time she joined NBC, she never attempted to remove the poster nor did she ever complain about it to Browne.

We find that neither Schneider nor any other NBC employees were offended when viewing these posters. The display of the female anatomy is far more revealing and suggestive in advertisements in the media than in either of these posters. Thus, a reasonable woman would not find these posters offensive.

Schneider also claims that in September 1981, while she was aboard a boat covering a story on shark research, "someone ... told her" that the pornographic movie "Debby Does Dallas" was included in the crew's video equipment. However, Schneider never saw the movie, all other members of the crew denied that this incident occurred and she failed to report this incident to NBC management.

Schneider also complained about the sleeping arrangements on that trip. She was asked by the Captain of the ship to share a room with Steigelman, a male member of the crew. This request was made simply because there was only one room available. There are no allegations that any sexual advances were made by Steigelman nor did Schneider complain to Browne about the sleeping arrangements.

Another incident concerning sleeping arrangements occurred while Schneider was on assignment in Honduras in 1983. Schneider claims that she was told by producer Vic Walter that she would have to share a room with her partner, Jon Porembski, because Walter was sharing his room with a female interpreter. When Schneider objected to the arrangement, the room assignments were changed. Walters denied that this incident occurred. In this instance, no sexual advances were made toward Schneider, she did not report the incident to Browne, nor did she sleep in the same room with Porembski.

Schneider additionally claims that her assignments with Porembski contributed to the sexually hostile atmosphere. This claim is rejected. In 1981, during a flight, Porembski asked her if she were a member of the "Mile High Club." When Schneider answered in the negative, he responded, "Would you like to be?" Her claimed fears of working with Porembski are dismissed as frivolous. She was paired with Porembski as cameraperson/sound technician on approximately 160 stories during the period of her employment. She never expressed these fears or misgivings to Browne or anyone else at NBC management.

As further evidence of a sexually hostile environment, Schneider refers to an incident that occurred in 1986 or 1987, where she saw a group of men in Browne's office reviewing news coverage of college students' annual visit to Southern Florida for Spring Break. Schneider states that while viewing the tapes, the men watched close-ups of "breasts and cleavage" and made comments such as "check this one out." Browne was not present during this episode and had no knowledge of its occurrence. Schneider did not complain to anyone about the incident.

Reference is also made by Schneider to instances where male members of the crew were seeking sexual favors during assignments away from home. Schneider claims that she "overheard two technicians talking in front of Browne on one occasion regarding their exploits with women while travelling." The contribution to the hostile atmosphere apparently is Schneider's opinion that she would interfere with "such activities when paired with a male technician for out-of-town assignments." (Plaintiff's Post Trial Memo. at 17). A reasonable woman with Schneider's experience of being paired with male camerapersons during the entire period of employment would not harbor such thoughts.

Schneider also refers to an instance when she walked into Browne's office wearing a T-shirt with a written message on the front. Browne then stated, "Debi is always wearing these T-shirts with writing on them that draw attention to her breasts." (Plaintiff's Post Trial Memo. at 19). While this may have been an insensitive remark, it is clear that Schneider was in no way offended by it, nor did she construe in a sexual manner.

Schneider also alleges that when Browne shouted at her in front of other employees, that such behavior constituted sexual harassment. We find that incidents of this kind often occur when running a business. In fact, Schneider conceded that such practice was not directed at women, but at all employees of both sexes. We can understand that under the pressures generated by the goal of bringing certain news before the television audience, that people occasionally will lose their tempers.

Other claims of Browne's misconduct toward women, as alleged by Schneider, concern Browne's statement, "[I wish] I could put my arms around that babe," when referring to a female production assistant. When he hired a former Dolphin's cheerleader, "Browne commented about her cheerleading background, not her qualifications in broadcasting. Likewise, when Teri Brito was hired as a new producer, Browne commented to plaintiff that Brito used to be a model, but nothing about her profes-

sional qualifications." (Plaintiff's Post Trial Memo. at 28). We find that these isolated incidents, having to do with comments regarding other employees, did not offend Schneider at the time they were allegedly made and do not rise to the level of sexual harassment.

## NBC Workforce

Females held positions in every classification at the Miami Bureau including top management: Liz Sintay, Deputy Bureau Chief and Bureau Coordinator; Elizabeth Shannon, Manager of Finance and Administration; Diane Festa, Production Assistant promoted to Bureau Coordinator; Patricia Kopco, Editor; Nicole Szulz, Senior Field Researcher; Cecilia Alvian, Senior Field Producer in Latin America; Adrianne Foglia, Producer; Shauna Singletary, Producer; Bonnie Anderson, Correspondent.

NBC maintained sub-bureaus in Central and South America headed by women: Nancy Cole in El Salvador, Elena Caldera in Nicaragua, Mimi Lava and Therese Aponte in Honduras, Adrienne Foglia in Colombia, Sharon Stevens in Managua. Cecilia Alviar, Senior Field Producer, had final authority in the region.

Schneider was one of two sound technicians together with Joe Valle. She was the only female sound technician during her period of employment. When Valle resigned to become a free lancer, he was succeeded by a male. There is no showing that a female applied for the position.

## DISCUSSION

Schneider attempts to show sex discrimination by comparing her assignments as to number and type, foreign and domestic, with Valle's assignments. We find that throughout her period of employment, Schneider's assignments compared favorably with Valle's assignments as to number and type of story covered.

Schneider failed to receive some assignments because of incompetence, indifference, refusal to submit to the authority of directors, producers and correspondents, and unreliability. It was only through the effort and insistence of Browne, Seaman

and Sintay that members of the crew accepted her despite her shortcomings. Her physical disability accounted for lack of assignment to some areas for a period of time. Schneider complains that the use of freelancers affected her in a discriminatory manner. We find that the use of freelancers by NBC was a bona fide business practice that affected both male and female employees at NBC. For example, on Latin American assignments it was necessary to have at least one bilingual member of the crew. If a bilingual staff member was not available, NBC used a bilingual freelancer. Management preferred Valle over Schneider for some assignments because he was bilingual and she was not.

■ We turn to Schneider's claim of sex discrimination based on theories of disparate treatment and disparate impact. The significant difference in proof to sustain a disparate treatment claim from a disparate impact claim, is that in a disparate treatment claim, the plaintiff must prove discriminatory animus, *Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248, 256, 101 S.Ct. 1089, 1095, 67 L.Ed.2d 207 (1981), while in a disparate impact case, the plaintiff is not required to prove discriminatory animus. In a disparate impact claim, the plaintiff must prove that the challenged practice of the employer had a discriminatory impact on the plaintiff. *Connecticut v. Teal,* 457 U.S. 440, 451, 102 S.Ct. 2525, 2533, 73 L.Ed.2d 130 (1982) ("Title VII strives to achieve equality of opportunity by rooting out 'artificial, arbitrary and unnecessary' employer created barriers to professional development that have a discriminatory impact upon individuals.").

*Disparate Treatment Theory*

■ We find that Schneider made out a prima facie case on her claim of disparate treatment. *McDonnell Douglas v. Green,* 411 U.S. 792, 802, 93 S.Ct. 1817, 1824, 36 L.Ed.2d 668 (1973). However, defendants affirmatively proved that the number and type of assignments offered Schneider would have been substantially the same had she been a man. The failure to assign Schneider to shoots that she claims were denied her because of her sex was not gender related, but due in part or whole to:

(a) incompetence (early in her career);

(b) reluctance and/or refusal of members of the crew to work with her as a result of the other factors listed;[6]

(c) unreliability as demonstrated by her unexplained lateness or absences;

(d) challenging the authority of superiors, and insubordination;

(e) emotional problems that interfered with an efficient personal relationship with other members of the crew;

(f) inability to converse in Spanish.

Based on these findings of fact, we hold that defendants articulated legitimate, non-discriminatory reasons for denying Schneider assignments to which she believed she would have received were she a man. We also find that these same non-discriminatory reasons apply to her assignments in the tape library. *McDonnell Douglas, supra.*

■ Schneider has failed to establish discrimination in any condition of employment at NBC during the period of her employment and has failed to establish discriminatory intent by a preponderance of the evidence.[7]

*Disparate Impact Theory*

■ Schneider bears the burden of showing that a facially neutral employment practice had a significant adverse effect on her conditions of employment. The facially neutral employment practice may include subjective or discretionary employment practices. *Hill v. Seaboard Coast Line R. Co.,* 885 F.2d 804, 811 (11th Cir.1989) citing

---

6. We find that the refusal of crew members to work with Schneider was not based on sex.

7. Having found that sex was not a factor in any employment decision made by NBC, we do not believe that defendants have the burden of establishing by a preponderance of the evidence

that it would have made the same decision about the plaintiff's sex. *Price Waterhouse v. Hopkins,* 490 U.S. 228, 258, 109 S.Ct. 1775, 1795, 104 L.Ed.2d 268 (1989). If this burden were placed on defendants, we find that defendants would have sustained their burden.

*Watson v. Fort Worth Bank & Trust,* 487 U.S. 977, 991, 108 S.Ct. 2777, 2787, 101 L.Ed.2d 827 (1988). ("The plaintiff must demonstrate that it is the application of a specific employment practice that has caused the disparity." *Hill, supra* citing *Wards Cove Packing Co. v. Atonio,* 490 U.S. 642, 657, 109 S.Ct. 2115, 2125, 104 L.Ed.2d 733 (1989)).

### SO CALLED "RIGHT OF REFUSAL"

Schneider points to NBC's "right of refusal" policy which she claims disparately impacted on her since she was denied "assignments because of the subjective, unexamined biases of the camera operators, editors, producers and correspondents whose preferences whether to work with her are honored." (Plaintiff's Post Trial Memo. at 85).

■ Schneider, having made out a prima facie showing to support her theory of disparate impact, defendants have "the burden of producing evidence of the business justification; [however], the ultimate burden of persuasion remains on the plaintiff." *Hill* at 812 citing *Wards Cove,* 490 U.S. at 660, 109 S.Ct. at 2126. Schneider's ultimate burden of persuasion is to demonstrate "that the proffered employment justification was insubstantial and pretextual, or by demonstrating pretext because other selection devices, without similarly undesirable racial effect, would equally serve the employer's interests." *Hill* at 812, again citing *Wards Cove, supra.*

■ The need for discipline and cooperation among the members of the team and particularly between the cameraperson and sound technician is obvious. All must have confidence in the competence and reliability of the other members of the team. NBC had a legitimate business interest in putting together a team that could "get along" with each other. This was of greater significance in foreign assignments, where the shoot might take a number of days under inconvenient, distressing and risky conditions.

NBC showed that Browne, Seamans and Sintay at various times overcame the objections or resistance of team members to whom Schneider was assigned. In any event, the failure to assign Schneider because of such "right of refusal" did not substantially affect the number of assignments or deprive her of breaking news stories, i.e., combat situations, hazardous stories (earth quakes, volcano eruptions).

Schneider's rejection by members of the team was not based on sex.

Defendants have produced evidence of a business justification for a policy or "right of refusal" by members of a team assigned to a shoot.

*The Claim of a Sexually Hostile Work Environment*

■ To establish a claim of a violation of Title VII based on a sexually hostile work environment, the plaintiff must prove that (a) she belongs to a protected group; (b) she was subject to unwelcome harassment; (c) the harassment was based on sex; (d) that the harassment involved affect a "term, condition or privilege" of employment; and (e) the employer knew or should have known of the harassment. *Henson v. City of Dundee,* 682 F.2d 897, 903–05 (11th Cir.1982).

The Court in *Meritor Savings Bank v. Vinson,* 477 U.S. 57, 66–67, 106 S.Ct. 2399, 2405, 91 L.Ed.2d 49 (1986) quoting *Henson* and citing *Henson* in defining such a claim stated:

[A] plaintiff may establish a violation of Title VII: by proving that discrimination based on sex has created a hostile or abusive work environment. As the Court of Appeals for the Eleventh Circuit wrote in *Henson v. Dundee,* 682 F.2d 897, 902 (1982):

"Sexual harassment which creates a hostile or offensive environment for members of one sex is every bit the arbitrary barrier to sexual equality at the workplace that racial harassment is to racial equality. Surely, a requirement that a man or woman run a gauntlet of sexual abuse in return for the privilege of being allowed to work and make a living can be as demeaning and disconcerting as the harshest of racial epithets."

Accord, *Katz v. Dole,* 709 F.2d 251, 254–255 (CA4 1983); *Bundy v. Jackson,* 205 U.S.App.D.C. [444] at 444–454, 641 F.2d [934] at 934–944 [1981]; *Zabkowicz v. West Bend Co.,* 589 F.Supp. 780 (ED Wis.1984).

Of course, as the courts in both *Rogers* [*v. E.E.O.C.,* 454 F.2d 234 (5th Cir.1971), *cert. denied,* 406 U.S. 957, 92 S.Ct. 2058 [32 L.Ed.2d 343] (1972) ] and *Henson* recognized, not all workplace conduct that may be described as "harassment" affects a "term, condition, or privilege" of employment within the meaning of Title VII. *See Rogers v. EEOC, supra,* at 238 ("mere utterance of an ethnic or racial epithet which engenders offensive feelings in an employee" would not affect the conditions of employment to sufficiently significant degree to violate Title VII); *Henson,* 682 F.2d, at 904 (quoting same). For sexual harassment to be actionable, it must be sufficiently severe or pervasive "to alter the conditions of [the victim's] employment and create an abusive working environment."

■ Viewing the totality of the circumstances over the period Schneider claims they occurred, we find that Schneider failed to show the creation or maintenance of a sexually hostile working condition. Schneider never complained about the incidents she now claims constituted the hostile environment until she filed charges of discrimination on or about April 10, 1988 with the Metropolitan Dade County Fair Housing and Appeals Board and the Equal Employment Opportunity Commission.

When Schneider resigned from her position on August 5, 1988, she resigned to join her husband who was stationed in Atlanta, Georgia, and not because of working conditions at NBC.

## CONCLUSION

The complaint is dismissed. A judgment dismissing the complaint is issued simultaneously herewith and will be filed in the Office of the Clerk of the United States District Court for the Southern District of Florida.

This memorandum of decision and order contains findings of fact and conclusions of law required under Fed.R.Civ.P. 52(a).