737 F.2d 747
 35 Fair Empl.Prac.Cas. 110,
34 Empl. Prac. Dec. P 34,457, 18 Ed. Law Rep. 545
 Urduja Monroy BALICAO, Appellant,
v.
The UNIVERSITY OF MINNESOTA, Stephen Roszell, individually
and as Director of Alumni Relations for the
University of Minnesota, Appellees.
 No. 83-1880.
 United States Court of Appeals,
Eighth Circuit.
 Submitted April 9, 1984.
Decided June 26, 1984.
 
 Carlsen, Greiner & Law by Jeffrey G. Lalla, Lisa I. Vessey, Edina, Minn., for appellees.
 William J. Mavity, Minneapolis, Minn., for appellant Urduja Monroy Balicao.
 Before LAY, Chief Judge, and McMILLIAN and JOHN R. GIBSON, Circuit Judges.
 LAY, Chief Judge.
 
 
 1
 Urduja Balicao appeals from the district court's finding that her termination from the University of Minnesota was not based on a discriminatory motive or in retaliation for exercise of her civil rights. We conclude that the findings of fact and conclusions of law of the district court were not clearly erroneous and affirm.
 
 Facts
 
 2
 Urduja Balicao is a female United States citizen of Filipino origin. She was employed at the University of Minnesota from June 17, 1974, until her termination on November 16, 1980. Balicao held the position of Principal Accountant for the Department of Alumni Relations.
 
 
 3
 In November of 1979, in an interview with William C. Thomas, Assistant Vice-President for Administration and Personnel, Balicao suggested that disparate merit increases given to her and a fellow, male employee might have been based on impermissibly discriminatory reasons. Thomas investigated and corresponded with Balicao's supervisor, Stephen Roszell, eventually settling the complaint in July of 1980.
 
 
 4
 Sometime in early 1980, Roszell and an intermediate supervisor of Balicao, Nancy Meyer, began documenting alleged deficiencies in Balicao's work. Although Roszell had given Balicao a "superior" rating on a performance evaluation in October of 1979, in a March 17, 1980 memo from Robert Odegard, Associate Vice-President of Balicao's department, to Thomas, Roszell was cited as stating that Balicao was "short on training" and that all of her previous supervisors had criticized her for this deficiency.[1] In January of 1980, Roszell sent a letter to Balicao specifying changes in her duties that were to take effect immediately. Among the changes to be made were a shift in Balicao's workplace from a private office to a group work setting, the formal placing of Balicao under Nancy Meyer's supervision, and the reassignment of some of Balicao's duties to another employee. During the next eight months, Meyer and Roszell exchanged with Balicao numerous memoranda regarding problems with Balicao's work. On approximately November 15, 1980, Balicao was terminated from her employment with the University.
 
 
 5
 At trial, the district court, the Honorable Robert G. Renner presiding, held that the proximity of Balicao's discrimination complaint and her eventual firing established a prima facie case of impermissible discrimination. However, the court further held that the reasons articulated by the University for terminating Balicao were not pretextual and that Balicao did not meet her burden of persuasion. In its comprehensive discussion of the evidence presented, the district court stated:
 
 
 6
 The evidence is convincing that Ms. Balicao is a strong willed person whose actions led to communication problems with her superiors. She opposed being placed under her appointed supervisor, Nancy Meyer; she opposed being moved from the conference room; she opposed implementing accounting procedures as ordered by Meyer; and, in general, utilized accounting practices which were her's and her's alone. When errors were found she was prone to blame others. She took advantage of her employer by coming to work late and then working after hours, thus accumulating overtime.
 
 
 7
 * * *
 
 
 8
 * * *
 
 
 9
 Plaintiff implies that her supervisor, Meyer, was also retaliating against her by reason of her earlier charge of discrimination. The relationship, however, between Meyer and Balicao hardly supports the implication. When asked by Meyer to accrue interest plaintiff refused. She ignored other requests from Meyer relative to established accounting practices and policies. Her treatment of salary records was improper in that she rejected orders to properly account for income taxes and social security withholding. When the auditors gave plaintiff the adjusting entries she neglected to enter them on the records for inordinate periods of time. Her treatment of depreciation accounts was not done on a monthly basis. Even though the books were maintained on a modified cash basis it was necessary to keep these accounts current.
 
 
 10
 Balicao points out that Roszell had, in October, 1979, given her a superior rating. It must be remembered that he was not an accountant and had at the time only been on the job but approximately five months. Also, although he had rated her a 4 out of 5, he had given no one less than a 4 of the 15 employees under him. It was his testimony, which the court accepts, that he had only assumed his position in April, 1979 and that he did not want to make "rash judgments".
 
 
 11
 There were many differences on plaintiff's bank reconciliation statements which had no corresponding journal entries. When Stella Johnson, plaintiff's replacement, assumed the position of Principal Accountant, she found that checks had been carried forward that were over one year old. In two instances checks had been issued in different amounts than shown on the books. Ms. Johnson could not find necessary information required to be stated in plaintiff's ledgers and journals.
 
 
 12
 The Peat Marwick, Mitchell & Company management letter followed the annual audit for the fiscal year ending June 30, 1979. It called for large audit adjustments so as to fairly state the alumni association's financial position. The auditor's annual report for the fiscal year ending June 30, 1980 cited numerous deficiencies in the books of the Alumni Association and the Alumni Club and called attention to misstatements in general ledger accounts of both. Because of this report Roszell feared he might lose his job.
 
 
 13
 * * *
 
 
 14
 * * *
 
 
 15
 The court is satisfied that more than sufficient grounds existed for plaintiff's discharge, that those grounds were the reason for her termination, that the defendants did not discriminate against plaintiff by reason of her sex, or national origin, and finally, that the discharge was not in retaliation for plaintiff's attempt to seek and get her rightful complete 6% civil service salary adjustment.
 
 Discussion
 
 16
 We agree that the proximity of Balicao's discrimination complaint and her termination established a prima facie case of retaliatory discharge. Balicao urges that we view the sudden and unprecedented criticism of her work as demonstrating that the district court's findings were clearly erroneous. Although the University was able to present objective evidence at trial that Balicao's work was in fact deficient in several important areas, we agree that a strong inference of discriminatory motivation was raised. However, this court does not sit as a trier of fact. Our standard of review is narrow; the findings of fact of the district court will be overturned only if they are clearly erroneous. Fed.R.Civ.P. 52(a). As the Supreme Court has stated:
 
 
 17
 In applying the clearly erroneous standard to the findings of a district court sitting without a jury, appellate courts must constantly have in mind that their function is not to decide factual issues de novo. The authority of an appellate court, when reviewing the findings of a judge as well as those of a jury, is circumscribed by the deference it must give to decisions of the trier of the fact, who is usually in a superior position to appraise and weigh the evidence. The question for the appellate court under Rule 52(a) is not whether it would have made the findings the trial court did, but whether "on the entire evidence [it] is left with the definite and firm conviction that a mistake has been committed." United States v. United States Gypsum Co., 333 U.S. 364, 395, 68 S.Ct. 525, 542, 92 L.Ed. 746 (1948).
 
 
 18
 Zenith Radio Corp. v. Hazeltine Research, Inc., 395 U.S. 100, 123, 89 S.Ct. 1562, 1576, 23 L.Ed.2d 129 (1969). The clearly erroneous standard also applies to the question of intent. Pullman-Standard v. Swint, 456 U.S. 273, 288, 102 S.Ct. 1781, 1789, 72 L.Ed.2d 66 (1982).
 
 
 19
 After an exhaustive examination of the record in the instant case, we cannot say that the district court erred in its findings of fact or conclusions of law. Although the circumstances of Balicao's termination raise serious questions as to the motivation of her superiors, sufficient evidence exists to support the district court's conclusion that Balicao was terminated for legitimate, non-discriminatory reasons.
 
 
 20
 Independent auditing by the accounting firm of Peat, Marwick, Mitchell & Co. in 1979-80 revealed problems with the method of accounting used by Balicao. Documents exist showing that Balicao was reluctant, or even neglected, to take steps to correct the existing problems. Numerous other problems existed and are cited by the district court. The decision to credit the testimony of the defendant's witnesses who cited Balicao as the source of these problems over Balicao's explanations is not clearly erroneous.
 
 
 21
 Importantly, the district court found, and plaintiff does not dispute, that Roszell and Meyers did not learn of Balicao's discrimination complaint until some time after the problems with Balicao's work surfaced. In fact, Roszell became critical of Balicao's work shortly after he was installed in his position and he mentioned several of the problems at a meeting of the Executive Committee of the Alumni Association in January of 1980, a full month before he became aware of Balicao's complaint. Nancy Meyer began suggesting changes in Balicao's work virtually upon her installation as Balicao's supervisor in January of 1980. However, undisputed testimony established that Meyer did not learn of Balicao's complaint until June of 1980, six months after taking the supervisory position. The sudden criticism of Balicao's work appears temporally linked to the installation of Roszell and Meyer as Balicao's supervisors. We cannot say that the district court should have found that Balicao's termination was the result of a campaign of retaliation for her protected activity.
 
 
 22
 We conclude that sufficient evidence exists to uphold the district court's findings of fact and conclusions of law. We therefore affirm the judgment in favor of the defendants.[2]
 
 
 23
 Each party to pay its own costs.
 
 
 24
 McMILLIAN, Circuit Judge, dissenting.
 
 
 25
 I respectfully dissent. After reviewing the briefs, record and arguments in this case, I am "left with the definite and firm conviction that a mistake has been committed." United States v. United States Gypsum Co., 333 U.S. 364, 395, 68 S.Ct. 525, 542, 92 L.Ed. 746 (1948); Craik v. Minnesota State University Board, 731 F.2d 465 at 468 (8th Cir.1984). The temporal connection between appellant's discrimination claim and her falling into disfavor with her supervisor, after five and one-half years of satisfactory performance, strongly indicates that more than coincidence is at work. I believe that the record makes clear that the two events were directly and causally related.
 
 
 26
 The majority opinion glosses over many disturbing facts adduced at trial. The majority states that the sex discrimination claim, initiated in November 1979, was eventually settled in July 1980. The majority makes no mention of the fact that appellant's supervisor, Stephen Roszell, adamantly opposed settlement believing that the claim involved a matter committed to a supervisor's sole discretion. During the months leading to the settlement, Roszell closely monitored appellant and made several complaints, always in writing, about her job performance which later proved to be unjustified. For example, in a memorandum dated January 31, 1980, Roszell criticized appellant for late payment of a bill which was later found on Roszell's desk waiting for his initialing. In April 1980 Roszell accused appellant of fourteen hours of unexplained absences and later learned and admitted that thirteen of those hours were requested in advance and documented. What emerges is a search for a pretextual basis for discipline and eventually discharge.
 
 
 27
 Even assuming that Roszell had a legitimate concern for improvement in appellant's job performance, the only inference I am able to draw from the evidence is that appellant would not have been discharged in the absence of her discrimination claim. Thus, even applying the strict standard of causation from Mt. Healthy School District v. Doyle, 429 U.S. 274, 285-87, 97 S.Ct. 568, 575-76, 50 L.Ed.2d 471 (1977), I believe the district court's finding of no retaliatory discrimination is clearly erroneous.
 
 
 28
 The record reveals that appellant was hesitant to go forward with the discrimination charge lest it upset her supervisor and cost her her job. She was assured, and properly so, by the Assistant Vice President for Administration and Personnel that such retaliatory action would and could not be taken. I believe that the majority opinion today will serve to confirm the feeling among employees that even though one may be the victim of discrimination in violation of Title VII, he or she best remain silent. I would reverse the judgment of the district court and remand for a determination of the appropriate relief to be granted appellant.
 
 
 
 [1]
 The evidence is undisputed that Balicao received "superior" ratings from her supervisor for the two previous years and an "adequate/competent" rating in her first year at the University
 
 
 [2]
 In Womack v. Munson, 619 F.2d 1292 (8th Cir.1980), cert. denied, 450 U.S. 979, 101 S.Ct. 1513, 67 L.Ed.2d 814 (1981), the justification offered by the sheriff-employer for the plaintiff's discharge was an integral part of the plaintiff's protected activity. This court in holding that the district court's judgment for the employer was clearly erroneous pointed out that the justification offered by the employer could not, under the law, constitute an independent and legitimate reason for discharge. Thus, the finding of a legitimate basis for discharge was clearly erroneous. The facts at bar are clearly distinguishable. The employer's assertion that Balicao was deficient in her work quality is completely distinct from her earlier claim of discrimination in pay increases
 Where the evidence is conflicting, even though suggesting mixed motives, the role of the appellate court is not to try a case de novo or to make findings of fact. Our responsibility as appellate judges ends when we find there is substantial evidence supporting the district court's finding of fact and when we thus cannot say, with firm conviction, that a mistake has been made. The latter phrase, although no talismanic formula, does not mean simply that because we may be sympathetic to the losing party or would have determined conflicting facts differently we have the authority to say that we have a firm conviction of a mistake having been committed.
 To say that a trial court's finding in a given case is not clearly erroneous, particularly where there exists strong evidentiary support, should not lead to a rhetorical charge that victims of discrimination should "remain silent." This statement by the dissent will do more to cause apprehension among victims of discrimination than the mere affirmance by this court of a district judge's findings of fact.