**Runnette HICKS**

v.

**BALTIMORE GAS & ELECTRIC COMPANY.**

**Civ. No. L–90–3282.**

United States District Court, D. Maryland.

Dec. 1, 1992.

Runnette Hicks, pro se.

L. Ellis Justice, Jr., Baltimore, MD, for defendant.

## MEMORANDUM

LEGG, District Judge.

In this Title VII action, the Court is called upon to decide the motion for summary judgment filed by the defendant, Baltimore Gas & Electric Company ("BG & E"). For the reasons set forth below, the Court will, by

separate order, DISMISS plaintiff's termination and retaliation claims for lack of subject matter jurisdiction and GRANT the defendant's motion with respect to plaintiff's differential treatment and harassment claims.

## I. *Facts*

Plaintiff Runnette Hicks was an employee of BG & E from 1974 to 1989. During that time, she advanced from a position as a grade three Key Punch Operator to that of a grade eleven Senior Computer Operator. From 1974 until December 1987, Ms. Hicks was a productive, valued, and hardworking employee.

Beginning in December of 1987, Ms. Hicks began to experience problems at work. Over the course of the next year, she missed over eighty-five days of work due to stress and other health problems. In addition, her co-workers noticed that Ms. Hicks suffered from mood swings, paranoia, and irritability, and that she had a difficult time working with others. On several occasions, Ms. Hicks angrily confronted co-workers and supervisors, whom she believed were talking about her behind her back and/or spying on her.

In January 1989, Ms. Hicks' supervisor, Ray Spitznas, received a written complaint from Elliot Wallace, a co-worker of Ms. Hicks. The complaint detailed a number of confrontational incidents between Ms. Hicks and her co-workers and expressed concern about Ms. Hick's behavior.[1] Mr. Spitznas investigated the complaint by speaking with Ms. Hicks' co-workers, who confirmed that she had been acting erratically and that her behavior frightened them at times. After consulting with BG & E's Medical Department, Mr. Spitznas referred Ms. Hicks to BG & E's medical service for a "Fitness For Duty Examination" ("FFD").[2]

On January 10, 1989, Ms. Hicks reported to BG & E's medical department for her FFD exam. She was preliminarily examined by Diane Jacobs, a physician's assistant, who noticed that Ms. Hicks was agitated, angry, and unable to concentrate. Concerned that Ms. Hicks' aberrational behavior was due to the presence of drugs in her system, Ms. Jacobs requested and received permission from Dr. Susan Guarnieri, the Medical Director at BG & E, to perform a urinalysis test on Ms. Hicks.

The urinalysis revealed that Ms. Hicks had no drugs in her system. As a result, Ms. Jacobs consulted with Dr. Guarnieri about referring Ms. Hicks for a psychological evaluation with a BG & E staff psychologist to determine the reasons behind Ms. Hicks' behavioral problems. Dr. Guarnieri consented. Ms. Hicks, however, refused to consent to the evaluation.

Dr. Guarnieri met with Ms. Hicks and explained that, under BG & E policy, Ms. Hicks could be disciplined and/or terminated for refusing to submit to the psychological exam. Believing that Ms. Hicks might be suspicious of a staff psychologist, Dr. Guarnieri gave Ms. Hicks the option of choosing the therapist, with BG & E to pay the expense. Ms. Hicks refused. As a result, Ms. Hicks was suspended from work for four days.

In February 1989, Ms. Hicks filed a complaint with the Maryland Commission on Human Relations alleging that she had been discriminated against on the basis of her sex because (i) a male employee with whom she argued in December 1988 was not referred for an FFD, while she was; (ii) she had lost overtime hours; and (iii) management failed to discipline a fellow employee who had been calling her names.[3]

Following her return to BG & E from suspension, Ms. Hicks continued to behave erratically at work. In May 1989, Ms. Hicks

---

1. Defendant's exhibit 9 attachment B.

2. Under BG & E policy, an employee may be referred for an FFD exam if she "exhibit[s] performance or behavior problems which raise questions about [her] fitness for duty." This exam "may include a detailed medical history, examination of vision and hearing, and drug, alcohol and psychological screening." BG & E policy states that "[a]ll parts of the examination will be ordered by the Medical Director and considered a work assignment. Refusal by an employee to submit to any part will result in disciplinary action up to and including discharge." Defendant's exhibit 10.

3. Defendant's exhibit 1.

was given a formal warning for "failing to follow instructions as directed by her supervisor."[4] In July 1989, she was placed on probation because of her frequent absences from work.[5] On October 3, 1989, Ms. Hicks verbally confronted acting supervisor Warren Schindhelm after he requested that she perform a work-related task. She argued with Mr. Schindhelm, challenged his authority, and dared him to fire her. Ms. Hicks was terminated the following day.

In March 1990, following an investigation, the Maryland Commission on Human Relations concluded that there was no evidence that Ms. Hicks had been treated differently at BG & E because of her sex and issued a finding that there was "no probable cause to believe that an act of discrimination occurred."[6] In May 1990, Ms. Hicks requested the EEOC to investigate the charges she had made in her Maryland Human Relations complaint. The EEOC found that there was no evidence to support a claim of differential treatment.[7] In December 1990, Ms. Hicks filed a complaint with this Court alleging that she had been terminated because of her sex, subjected to differential treatment at work on the basis of her sex, harassed, and retaliated against by BG & E.[8] BG & E moved for summary judgment with respect to every claim in Ms. Hicks' complaint. Ms. Hicks opposed the motion.

On October 30 and November 30, 1992, the Court conducted hearings and heard evidence from five witnesses subpoenaed by Ms. Hicks at government expense.[9] The witnesses who testified at the hearing were Diane Jacobs, Dr. Susan Guarnieri, Warren Schindhelm, Ray Spitznas, and Sylvia Faison.

4. Defendant's exhibit 15.

5. Defendant's exhibit 16.

6. Defendant's exhibit 1.

7. Defendant's exhibit 4.

8. Ms. Hicks is proceeding *in forma pauperis* in this action. Although she applied for appointment of counsel, the Court, after hearing from Ms. Hicks and evaluating the factors set forth in *Poindextor v. FBI*, 737 F.2d 1173, 1185 (D.C.Cir. 1984), denied the motion.

9. Because Ms. Hicks lacked the funds to conduct depositions, the Court ordered BG & E to pro-

## II. DISCUSSION

### A. *Termination, and Retaliation Claims*

■ The scope of a Title VII action filed in federal court is limited to "the scope of the administrative investigation that can reasonably be expected to follow the [administrative] charge of discrimination." *Chisholm v. U.S. Postal Service*, 665 F.2d 482, 491 (4th Cir.1981); *accord Nance v. Union Carbide Corp.*, 540 F.2d 718, 727 n. 20 (4th Cir.1976). In this case, the administrative charges filed by Ms. Hicks, and the investigations which followed, were limited to the issue of differential treatment with respect to Ms. Hicks's referral for an FFD exam, a four-day suspension, and her alleged lack of overtime assignments. Ms. Hicks never filed an administrative charge concerning her termination from BG & E with either the Maryland Commission on Human Relations or the EEOC, and no administrative investigation was conducted by either agency with respect to her termination.

Ms. Hicks made no mention of her termination in a May 15, 1990 letter she wrote to the EEOC, despite the fact that she had been terminated in October 1989. The first time Ms. Hicks alleged retaliation and discrimination with respect to her termination was in the complaint that she filed with this Court in December 1990. Even in that complaint, however, she cites the period in which the alleged discrimination took place as December 1987, almost two years before the date of her termination.

Because Ms. Hicks has failed to exhaust her administrative remedies with respect to

vide Ms. Hicks with a room in which she could interview potential witnesses who might testify on her behalf at a hearing. On September 8, 1992, Ms. Hicks wrote a letter to the Court indicating that she had found four witnesses who could testify for her. Subsequently, Ms. Hicks notified the Court that she wished to subpoena twenty-five witnesses at government expense, although without making a proffer to the Court regarding their likely testimony. Following a telephone conference with both parties, the Court granted Ms. Hicks permission to subpoena, at government expense, five witnesses to testify for her.

her termination and retaliation claims, and because they constituted no part of the administrative investigations conducted by the Maryland Commission on Human Relations or the EEOC, these claims are beyond the jurisdiction of this Court.[10] Accordingly, the Court will dismiss these claims for lack of subject matter jurisdiction.

### B. Differential Treatment/Harassment Claims

#### 1. Differential Treatment

In order to establish a *prima facie* case of differential treatment on the basis of sex, a plaintiff must show that (i) she was treated less favorably than similarly situated male employees and (ii) her employer was motivated by discriminatory intent. *Furnco Constr. Corp. v. Waters*, 438 U.S. 567, 98 S.Ct. 2943, 57 L.Ed.2d 957 (1978). A plaintiff may meet this burden with either "direct evidence of discrimination or [ ] indirect evidence." *Autry v. N.C. Dept. of Human Resources*, 820 F.2d 1384, 1386 (4th Cir.1987).

Ms. Hicks contends that she was treated differently than a similarly situated male employee when she was referred for an FFD exam following a verbal altercation with a co-worker named Elliot Wallace. Ms. Hicks alleges that while she was forced to undergo an FFD examination, Mr. Wallace was not.

Ms. Hicks has failed to produce any evidence, however, that she and Mr. Wallace were similarly situated individuals. To the contrary, there is ample evidence in the record that: (i) Ms. Hicks' work performance and relations with co-workers had deteriorated significantly by December 1988; (ii) she had missed many days of work due to stress and other health problems: and (iii) she was angry, unfocused, and unable to concentrate. There is no evidence in the record that Mr. Wallace evidenced any behavior which would warrant an FFD referral under BG & E policy.

At the hearings, the witnesses called by Ms. Hicks did not support her allegations of discrimination. To the contrary, they fully corroborated BG & E's defense that Ms. Hicks was a formerly satisfactory employee whose performance deteriorated because of psychological problems, who refused offers of help, and who was terminated when her job performance reached a point that was intolerable. Ms. Faison, a close friend of Ms. Hicks since childhood, testified on October 30, 1992 that she noticed a change in Ms. Hicks' behavior during the period in question. Ms. Hicks complained of being under a great deal of stress. Ms. Hicks became suspicious of Ms. Faison for no reason. On one occasion, Ms. Hicks phoned Ms. Faison to say that she had a new phone number; a short time later, Ms. Hicks called back to say that she had given an incorrect number because she did not think she could trust anyone. Ms. Faison also testified that she asked Ms. Hicks to seek psychological help [11], and that she stopped by Ms. Hicks' home on a few occasions because she was "worried" about Ms. Hicks.

Ray Spitznas, Ms. Hicks' supervisor from 1987 to 1989, testified at the hearing that he referred Ms. Hicks for an FFD exam because: (i) she had lengthy unexplained illnesses and absences; (ii) he received a written complaint about Ms. Hicks from Mr. Wallace; (iii) when he investigated the complaint, a number of Ms. Hicks' co-workers confirmed that she had exhibited unusual and frightening behavior; and (iv) he spoke with a doctor at BG & E's medical department who agreed that an FFD was warranted. Mr. Spitznas also testified that Ms. Hicks told him at a meeting that her phone was tapped by either BG & E, the FBI, or the CIA. Mr. Spitznas investigated the allegation and found it to be untrue.

Warren Schindhelm, Ms. Hick's previous supervisor, testified that she confronted him one day about her suspicion that he was

---

10. At the hearings, the Court gave Ms. Hicks wide latitude to offer evidence concerning her termination and retaliation claims. Even if her claims were properly before the Court, they could not have survived a summary judgment motion on the merits.

11. Unfortunately, Ms. Hicks did not follow this advice.

having her followed. He also testified that Ms. Hicks had been excessively absent, had had confrontations with employees, and had taken unscheduled vacation days.

Diane Jacobs, the physician's assistant who examined Ms. Hicks in January 1989, testified that Ms. Hicks seemed angry and unfocused when Ms. Jacobs attempted to elicit her medical history. During the physical exam, Ms. Hicks' mood oscillated from calm to angry, and Ms. Jacobs testified that she left her office door open during the exam because she was somewhat fearful of Ms. Hicks' erratic behavior.

Dr. Susan Guarnieri, BG & E's Medical Director and Baltimore's former Health Commissioner, testified that she alone, not Ms. Hicks' supervisors, had the power to authorize an FFD exam, and that she alone had the power to authorize urine tests and psychological evaluations. Dr. Guarnieri further testified that she believed that a urine test and psychological exam were warranted in Ms. Hicks' case because of her deteriorating work performance and the behavior Ms. Jacobs observed. In addition, Dr. Guarnieri testified that of 62 employees she ordered to take an FFD exam between January 1, 1988 and February 1, 1989, 58 were men and 4 were women. Of the eight who refused to take the exam, six (all male) were terminated and two (both female, including Ms. Hicks) received brief suspensions.[12]

■ Based on the testimony at the October 30 and November 30, 1992 hearings and the documentary evidence submitted to the Court, the Court finds that Ms. Hicks has failed to produce any evidence in support of a *prima facie* case of differential treatment with respect to either her FFD referral or the four-day suspension which followed her refusal to submit to a psychological evaluation. In fact, the evidence indicates that Ms. Hicks was treated *better than* male employees who refused to submit to an FFD, and that she received a shorter suspension than the other female employee who refused to consent to the exam.[13]

■ Ms. Hicks has also failed to introduce any evidence in support of her contention that her overtime hours were reduced because of her sex. BG & E, in contrast, has introduced evidence which reveals that the number of overtime hours Ms. Hicks worked compared favorably to the number that similarly situated male employees worked, especially when her many sick days are factored in.[14] Accordingly, the Court finds that Ms. Hicks has failed, as a matter of law, to establish even a *prima facie* case of differential treatment.

### 2. *Harassment*

■ In order to prove a claim of sexual harassment, a plaintiff must produce evidence tending to show "that the conduct in question was unwelcome, that the harassment was based on sex, [and] that the harassment was sufficiently severe or pervasive to create an abusive working environment. The plaintiff must also show some basis for imposing liability on the employer." *Swentek v. USAIR, Inc.*, 830 F.2d 552, 557 (4th Cir.1987).

Ms. Hicks alleges that she was subjected to a hostile work environment at BG & E because co-worker Elliot Wallace called her names. In her deposition testimony, however, Ms. Hicks admits that, during an argument with Elliot Wallace in December, 1988, she cursed at him and called him an "Uncle Tom".[15] The record is also replete with examples of instances in which Ms. Hicks behaved erratically and angrily toward both her co-workers and her supervisors and subjected them to offensive language.[16] Moreover, there is no evidence in the record that Ms. Hicks ever complained to a supervisor about

12. Ms. Hicks received a four-day suspension; the other female received a five-day suspension.

13. The Court also notes that, despite repeated absences, disciplinary actions, and behavioral problems, Ms Hicks was not terminated by BG & E until October, 1989, well after BG & E had legitimate grounds to do so.

14. Defendant's exhibit 9.

15. Runnette Hicks Dep. at 63, 66.

16. For example, a disciplinary action report filed on January 17, 1989 indicates that Ms. Hicks made obscene and racially-oriented remarks to co-workers on a number of occasions.

sexual harassment by her fellow employees,[17] nor that any took place while Ms. Hicks was employed at BG & E.[18]

## III. CONCLUSION

Because Ms. Hicks failed to exhaust her administrative remedies with respect to her wrongful termination and retaliation claims, the Court will dismiss these claims for lack of subject matter jurisdiction. In addition, because Ms. Hicks failed to produce sufficient evidence of sexual harassment or differential treatment, the Court will grant summary judgment in BG & E's favor with respect to these claims.

17. To the contrary, Ms. Hicks admits in her deposition that she never filed a grievance complaining about Elliot Wallace. Hicks Dep. at 193.

18. In her testimony before the Court, Ms. Hicks stated that there was a bulletin board at BG & E on which sexually-oriented cartoons were posted. The cartoons depicted men as well as women. · One of the cartoons or memos on the bulletin board contained derogatory comments and the word "Hicks", but Ms. Hicks testified that she did not know if the memo was directed to her or to a male employee named Hicks. Ms. Hicks could point to no other evidence of sexual harassment during her tenure at BG & E.