Kim A. **BALLETTI**, Plaintiff,

v.

**SUN–SENTINEL COMPANY**, formerly known as The News and Sun–Sentinel Company, Defendant.

No. 93–6091–CIV–Roettger.

United States District Court,
S.D. Florida.

Sept. 15, 1995.

William Amlong, Amlong & Amlong, Fort Lauderdale, Florida, for plaintiff.

Brenda Feiss, Seyfarth, Shaw, Fairweather & Geraldson, Chicago, Illinois, John R. Hargrove, Heinrich Gordon Batchelder, Hargrove & Weihe, P.A., Fort Lauderdale, Florida, for defendant.

### FINDINGS OF FACT AND CONCLUSIONS OF LAW.

SELTZER, United States Magistrate Judge.

Plaintiff, Kim A. Balletti, brought this action against defendant, Sun–Sentinel Company, seeking declaratory and injunctive relief and damages under the Civil Rights Act of 1964, 42 U.S.C. §§ 2000(e), *et seq.* ("Title VII").[1] Jurisdiction is founded on 42 U.S.C.

1. The plaintiff also asserted a pendent state claim under the handicap discrimination provisions of Chapter 760, Florida Statutes (1991). On November 25, 1994, the Court *sua sponte* declined

§ 2000e–5(f)(3) and 28 U.S.C. § 1331. On June 26–29, 1995, the parties tried to the Court the Title VII claims for hostile work environment sexual harassment (Count I) and for retaliatory discharge (Count II). Having heard the evidence and considered the written and oral arguments of counsel, the Court now issues its Findings of Fact and Conclusions of Law.

## A) *FINDINGS OF FACT*

The plaintiff, Kim Balletti, is a thirty-seven year old female. In June 1987, Balletti began her employment with the Sun–Sentinel as a Press Cleaner. Four months later she was promoted to Press Person I; she remained in that position until her termination.

Balletti came to the Sun–Sentinel with a long history of substance abuse. She started using marijuana in high school and eventually graduated to harder drugs, including speed, LSD, cocaine, and crack cocaine. In 1986, she entered the Stepping Stone Rehabilitation Program; but she was subsequently discharged from the program for continuing to use illegal drugs. Although Balletti maintains that she was drug-free at the time of her 1987 hiring at the Sun–Sentinel, she acknowledged that she continued to use drugs use after joining the company. She smoked marijuana, not only before coming to work, but also while on work breaks. She also used crack cocaine. In March 1988, Balletti informed the company of her relapse; the company advised her of the availability of rehabilitation and counseling. The following month, Balletti entered an in-patient rehabilitation program of her choice. The company kept Balletti's job open and permitted her to return to work after she had completed the program.

Balletti testified that throughout her employment at the Sun–Sentinel her male co-employees resented her presence in the pressroom. They pretended to spit and/or urinate on her, dropped cups of water on her, called her such names as "fucking cunt," "fucking bitch," and "diesel dike," left a dead cockroach at her work station, and posted on the bulletin boards sexually explicit stories, cartoons, and photographs. One male employee even exposed his genitals in her presence. Although Balletti had spoken generally to the company's EEO officer, Sue Vonderheide, about her personal conflicts with the pressroom men, she did not report these incidents either to Vonderheide or to other management personnel.

Deborah Harrell, a pressroom operator and former roommate of Balletti's, confirmed that several men in the pressroom used foul language and told dirty jokes. She maintained that such comments made her very uncomfortable. Harrell also corroborated Balletti's claim that men had directed abusive language to her. Further, Harrell disclosed that she encountered on the pressroom bulletin boards several offensive items: a sexually explicit poem; a story about "the rules of bedroom golf"; a cartoon of people having oral sex; an advertisement for blue jeans with a bare-breasted woman; and, a short essay on the uses of the word "fuck." Harrell removed these items because she felt they were demeaning toward women.

But Harrell acknowledged that Balletti never stated she felt sexually harassed or offended by the posters. And Harrell further admitted that she brought home some of the posters to share with Balletti because she thought they were humorous. Although she showed them to Balletti, she never showed the posters to company management.

In the spring of 1991, Balletti found at her work station a tube of vaginal cream labelled "Kim's Kunt Kreme." A few weeks later, while passing each other in the hallway, Balletti approached Sue Vonderheide and engaged her in casual conversation. She informed Vonderheide that she was being harassed and had encountered offensive material in the pressroom. Balletti showed Vonderheide the tube of vaginal cream, as well as a clipping of a newspaper photograph that had been posted on a bulletin board; the photograph had been altered to show Balletti kissing a female co-worker.

Vonderheide arranged for a meeting with Balletti and Rick Thompson, the director of the company's employee assistance program.

---

to exercise supplemental jurisdiction over the state law claim, as it presented both novel and complex questions of state law. The Court dismissed the claim (Count III) without prejudice pursuant to 28 U.S.C. § 1367(c)(1).

According to Vonderheide, Balletti disclosed the identities of several individuals who had called her names; but she did not state who she believed might have been responsible for placing the cream at her work station. Vonderheide reported that although Balletti claimed not to have been intimidated, she believed that an investigation would not change things and might even result in further problems. The company offered Balletti counseling, which she declined. Vonderheide, nonetheless, contacted corporate counsel to request an investigation.

On June 18, 1991, John Powers, outside counsel for the Sun–Sentinel's parent company, travelled to Fort Lauderdale to investigate Balletti's allegations. Powers met first with Rick Thompson and Richard Malone, a company vice president and the director of operations. Malone instructed Powers to conduct a thorough and complete investigation.

Powers then met with Balletti. He informed her that he was there to investigate her claims. Balletti was upset that Vonderheide had pursued the matter. She was reluctant to speak to Powers and told him she did not want anything further done. Eventually, however, she related to Powers the incident concerning the vaginal cream; she claimed she did not have any idea who was responsible for the incident. She also reported that an anonymous note, which read, "she will be sorry," had been left at her work station that day; again, she purported to have no idea who was responsible. Further, she told Powers about the newspaper clipping of her kissing a female co-employee. Balletti explained to Powers that pressroom workers engaged in frequent gags, including the posting of pictures with altered captions. Balletti acknowledged that she too had posted altered newspaper clippings. She spoke of one photograph regarding male baldness that she had altered; she had changed the face, superimposing a supervisor's photograph and inserting the caption, "Wanted—looking for a good bald man." Balletti never told Powers that she found any of the clippings or posters offensive. With regard to the vulgarities used in the pressroom, Balletti told Powers that they did not bother her. She volunteered that she called her co-workers names such as "asshole," "shithead," "dickhead," and "mother-fucker." Her co-workers, in turn, frequently referred to her as a "bitch" and an "asshole." The only term that she resented was the "C" word ("cunt"). Finally, she never disclosed that male employees had spat on her, exposed themselves, or left a cockroach at her work station; and, she never characterized the pressroom environment as hostile.

Balletti told Powers that she enjoyed her job and, generally, got along with her co-employees; the lone exception was Tim Phillips. She explained that her dispute with Phillips arose over a union decertification vote in which she and Phillips had been on opposite sides of the debate. Phillips had called her names, and Balletti had reported this to her supervisor, who responded by moving Balletti to a different area of the pressroom to separate her from Phillips. She added, however, that she did not believe Phillips was responsible for the cream incident, and she was adamant in not wanting Powers to speak to him or to anyone else.

Powers next interviewed Howard Parker, the person-in-charge of Balletti's crew. Parker stated that he did not have any knowledge of the reported incidents and did not know who might have been responsible. Parker stated that he also did not get along with Tim Phillips; but he was not aware that Phillips had used abusive language toward Balletti.

Following these interviews, Powers met again with Richard Malone and provided him the results of the investigation. Powers told Malone that the cream incident was crude and vulgar but that he had not been given any indication who was responsible. Even though the company had already adopted and circulated a sexual harassment policy,[2] Powers advised that the company take further measures by initiating sexual harassment training for its entire work force. The company agreed and, in the summer of 1992, began training each of its 1400 employees; the training was given in groups of 12 to 25.

---

**2.** In January 1991, Balletti signed a "Handbook Acknowledgement," representing that she had received a copy of the company-wide and local policies. The handbooks contained the company's sexual harassment policy, as well as its drug testing policy.

During these sessions, employees were apprised of the nature of sexual harassment, as well as the avenues available for its reporting.

Following Powers' investigation, Balletti never again complained to management of sexual harassment. At trial, however, Balletti maintained that sexually explicit cartoons and posters continued to appear on the pressroom bulletin boards. In September 1991, she found a cartoon of a rowing machine with a male penis; and, in October 1991, she found a photograph of a topless dancer. Balletti further testified that following her complaint to Vonderheide, she received a disciplinary warning concerning her work.

The Court received testimony from Gregory Hawkes, Balletti's pressroom supervisor. He had written up approximately thirty to forty employees for unsatisfactory performance. Hawkes testified that in August 1991 he issued Balletti a verbal warning for installing a plate upside down, the only such incident to have occurred in fifteen years. Hawkes attributed the error to Balletti's failure to pay adequate attention to her job. At the time he issued the warning, Hawkes was not aware that Balletti had earlier voiced a sexual harassment complaint to company management.

The Court also received testimony concerning Balletti's behavior toward her male co-employees. Scott Fatout is a pressroom person-in-charge. He worked on the same shift as Balletti in 1988 and 1989; thereafter, he continued to encounter Balletti two or three times each day. He possessed no apparent animus toward Balletti. According to Fatout, Balletti used vulgarities with such frequency that they became part of her ordinary language. She often directed such language to her co-workers; she called them "fucking assholes." Moreover, Balletti engaged in crude pressroom pranks. On one occasion, she grabbed hold of Fatout's pockets and attempted to pull down his pants. She succeeded only in ripping his pants, thereby exposing his bare buttocks. Fatout recalled that Balletti laughed at this incident. Fatout also reported that Balletti frequently described her sexual practices. She often remarked to several co-workers about her vibrator and touted the benefits of olive oil in intimate sexual encounters. On one occasion, when a pressroom discussion turned to the inability of a male co-worker to get a date, Balletti commented to the group that she (as a gay female) "ate more pussy" than they did. Finally, Fatout related an incident in which Balletti had asked him to make a fist in front of several co-employees. According to Fatout, Balletti commented that it was a "nice fist for fucking"; she then added, "You have never been fucked until you have been fist-fucked."

Barbara Carey, a female janitor in the pressroom, provided corroborating testimony. Carey stated that she frequently observed Balletti around her male co-workers. According to Carey, Balletti used vulgar language, telling the male employees that they were "fucking jealous" of her because she "gets more pussy" than they do.

On December 10, 1991, Balletti approached Barbara Carey, asking if she knew of any secret hiding places to smoke. Because employees are not permitted to smoke cigarettes within the building, Carey told Balletti it was not a good idea.

On December 11, 1991, Carey went to clean a small ladies bathroom located on the press deck. As she entered the bathroom, Carey smelled marijuana smoke and heard someone inside the lone stall ask who was there. Carey identified herself and, in turn, inquired who was inside the stall. The person inside the stall replied: "Shit, I thought you were someone else, and I just threw my joint in the toilet." Carey recognized the voice as Balletti's. Carey then looked under the stall and saw Balletti's work boots. She recognized them as Balletti's because of their distinctive appearance; they were completely torn.

Carey testified that she had found Balletti smoking cigarettes in the rest room on more than twenty prior occasions but had not reported those infractions. She decided to report this violation because marijuana, unlike cigarettes, is illegal; and, she did not want to be blamed for the incident. Carey immediately conveyed the matter to her supervisor, Lenny De Cristino, and later to the security director, Fred Heywood. Carey told Heywood unequivocally that Balletti had been smoking marijuana in the rest room.

Heywood found the report credible. Carey had distinctly recognized Balletti's voice, and she had never falsely accused another employee. Further, ten to twelve women worked in the pressroom over three shifts. This incident occurred on the day shift, the same shift on which Balletti worked. Heywood testified that only two or three women worked on the pressroom day shift. Finally, on December 12, 1991, another employee reported that she had smelled the odor of marijuana and had located the remains of a suspected marijuana cigarette in a waste paper receptacle in the ladies rest room.

Heywood relayed Carey's report to the vice president of human resources, Luis Lewin. They decided that there existed sufficient evidence upon which to request that Balletti submit to a drug test. But Lewin asked that Heywood also consult with Richard Malone; Malone, in turn, directed that Heywood speak to the pressroom manager, Don Bagby.

On December 12, 1991, at approximately 4:30 p.m., Heywood and Bagby met with Balletti. Bagby informed Balletti that she was reported to have been smoking marijuana in the ladies rest room; Balletti denied the allegation. Bagby then requested that Balletti submit to a drug test; Balletti refused. Bagby and Heywood informed her that company policy permitted her to be terminated if she continued to refuse the test; however, she did not change her mind. At the conclusion of the meeting, Bagby suspended Balletti without pay, and she was escorted from the building. Neither Heywood nor Bagby were aware at the time that Balletti had previously complained of sexual harassment to the Sun–Sentinel.[3]

On December 17, 1991, Balletti was called into the Sun–Sentinel. In the five days following her suspension, she had not changed her mind about taking the test. Bagby informed Balletti that she was being terminated for insubordination, specifically, for failing to take a requested drug test.[4] This decision was consistent with the treatment accorded every other employee who had declined a requested drug test; all had been terminated. Heywood informed Balletti of her right to appeal the termination decision through the company's internal grievance procedure, the Employee Alternative Resource program. Balletti never availed herself of this procedure.

■ On or about February 11, 1992, Balletti filed a Charge of Discrimination with the Florida Commission on Human Relations ("FCHR") and the Equal Employment Opportunity Commission ("EEOC"). On July 28, 1992, the FCHR issued a "No Cause Determination" as to all allegations contained in Balletti's charge. The Investigatory Report supporting the FCHR's Determination concluded that, based upon all the evidence, the Sun–Sentinel had neither retaliated against Balletti nor discriminated against or harassed her because of her sex. This determination concurred with an earlier decision by the Florida Unemployment Administration Commission ("FUAC") that Balletti was not entitled to benefits because she had been discharged from the Sun–Sentinel for misconduct. The FUAC's Investigatory Report, which was quoted by the FCHR as well, concluded:

> ... the employer had reasonable suspicion of recent drug use on the part of the claimant and acted accordingly in requesting her submission to a drug test. This request was reasonable and proper ... [T]he claimant's refusal to submit to the test, after acknowledging what the possible consequences might be, was misconduct connected with work.[5]

---

3. Heywood's testimony that he was not aware of Balletti's harassment complaint is uncontradicted. The record, however, contains conflicting evidence with respect to Bagby's knowledge. Sue Vonderheide recalled telling Bagby of Balletti's complaint. The Court, however, declines to credit her testimony in this limited respect. Bagby testified credibly that he had no knowledge of Balletti's complaint. He appeared forthright and sincere and did not equivocate on this point. Further, his testimony was corroborated by John Powers. Powers' testimony revealed, and his notes confirmed, that Bagby was not consulted about Balletti's complaint.

4. In arriving at his decision, Bagby consulted with Susan Morton in human resources, Richard Malone, and Fred Heywood; all agreed that Balletti should be terminated.

5. In this Circuit, EEOC reports and findings, as well as findings and conclusions by state agencies, are admissible and probative on the issue of whether the plaintiff was discriminated and/or

**1546**

## II. CONCLUSIONS OF LAW

Balletti seeks judgment on her Title VII claims. She maintains that she was initially subjected to hostile work environment sexual harassment and subsequently discharged in retaliation for engaging in conduct protected under Title VII.

### A. Hostile Work Environment Sexual Harassment

Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq.*, provides in pertinent part at 42 U.S.C. § 2000e–2:

(a) It shall be an unlawful employment practice for an employer—

(1) to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin. . . .

■■ The Supreme Court has held that Title VII is intended to eradicate not only economic and tangible discrimination, but the entire spectrum of disparate treatment, which includes requiring people to work in a discriminatorily hostile or abusive environment. *Meritor Savings Bank v. Vinson*, 477 U.S. 57, 64, 106 S.Ct. 2399, 2404, 91 L.Ed.2d 49 (1986). Title VII is violated, therefore, when the work place is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of employment and create an abusive working environment. *Id.* at 67, 106 S.Ct. at 2405. To establish a claim of hostile environment harassment, an employee must prove:

1. that she belongs to a protected group;
2. that she was subjected to unwelcome sexual harassment;
3. that the harassment complained of was based upon sex;
4. that the harassment complained of affected a term, condition, or privilege of employment; and
5. that the employer knew or should have known of the harassment and failed to take prompt remedial action.

retaliated against. *See Barfield v. Orange County*, 911 F.2d 644, 649–51 (11th Cir.1990), *reh'g denied*, 920 F.2d 13 (11th Cir.1990), *cert. denied*,

*Henson v. City of Dundee*, 682 F.2d 897, 903–05 (11th Cir.1982). *See also Faragher v. City of Boca Raton*, 864 F.Supp. 1552 (S.D.Fla.1994); *Schneider v. N.B.C. News Bureaus Inc.*, 801 F.Supp. 621, 632 (S.D.Fla. 1991). The parties do not dispute that Balletti has established the first and third elements of her claim. She is a female and, therefore, is a member of a protected group. Further, the harassment of which she complains, in particular, the tube of vaginal cream, was based upon her sex; it would not have been placed at her work station but for the fact that she is a female. Balletti, however, has failed to establish the remaining elements of her claim.

■■ In determining whether the conduct complained of was sufficiently severe or pervasive to have affected a term, condition, or privilege of employment, a court must consider all pertinent circumstances. *Harris v. Forklift Systems, Inc.*, —— U.S. ——, ——, 114 S.Ct. 367, 371, 126 L.Ed.2d 295 (1993). Among the factors appropriately considered are whether the discriminatory conduct is frequent or severe, whether it is physically threatening or humiliating, or a mere offensive utterance, and whether it unreasonably interferes with an employee's work performance. *Id.* Not only must the conduct be sufficiently severe or pervasive to create a work environment that is objectively hostile or abusive, but it also must be perceived subjectively as abusive by the victim; "if the victim does not subjectively perceive the environment to be abusive, the conduct has not actually altered the conditions of the victim's employment, and there is no Title VII violation." *Id.* at ——, 114 S.Ct. at 370.

■■ Whether a plaintiff subjectively perceived her work environment as abusive is closely related to another element of her claim—whether she welcomed the conduct. In *Meritor*, 477 U.S. at 68, 106 S.Ct. at 2406, the Supreme Court stated that "the gravamen of any sexual harassment claim is that the alleged sexual advances were 'unwelcome.'" The conduct at issue "must be unwelcome in the sense that the employee did

*Barfield v. Lamar*, 500 U.S. 954, 111 S.Ct. 2263, 114 L.Ed.2d 715 (1991).

not solicit or incite it, and in the sense that the employee regarded the conduct as undesirable or offensive." *Henson*, 682 F.2d at 903. Therefore, "[t]he correct inquiry is whether the [plaintiff] by her conduct indicated that the [complained-of behavior was] unwelcome." *Meritor*, 477 U.S. at 68, 106 S.Ct. at 2406. This question may present "difficult problems of proof and [turn] largely on credibility determinations committed to the trier of fact." *Id.*

 In determining whether a plaintiff, by her conduct, indicated that the behavior was unwelcome, the court may consider whether, as well as the manner in which, the plaintiff registered her complaint. *See Weinsheimer v. Rockwell International Corp.*, 754 F.Supp. 1559, 1564 (M.D.Fla.1990), *aff'd*, 949 F.2d 1162 (11th Cir.1991) (conduct was not "unwelcome" where plaintiff did not report offensive behavior until months after it happened and, even then, only in the course of casual conversation with supervisor); *Vermett v. Hough*, 627 F.Supp. 587, 598–99 (W.D.Mich.1986) (no sexual harassment found where plaintiff failed to report incident until three months later). Furthermore, the court may consider whether the plaintiff participated in the very conduct of which she complains. Where a plaintiff's action in the work place shows that she was a willing and frequent participant in the conduct at issue, courts are less likely to find that the conduct was "unwelcome" or "hostile." *See e.g. Reed v. Shepard*, 939 F.2d 484 (7th Cir.1991) (plaintiff could not argue that work environment was hostile where she instigated and participated in sexual horseplay and had "one of the foulest mouths" in the department); *Hicks v. Baltimore Gas*, 829 F.Supp. 791, 796 (D.Md.1992), *aff'd*, 998 F.2d 1009 (4th Cir. 1993), *cert. denied*, — U.S. —, 114 S.Ct. 726, 126 L.Ed.2d 690 (1994), *reh'g denied*, — U.S. —, 114 S.Ct. 1876, 128 L.Ed.2d 496 (1994) (plaintiff could not make out case of sexual harassment even though male co-workers called her names, sexually-oriented cartoons were posted on bulletin board, and one cartoon contained derogatory comments with her name; she admitted calling co-workers names, she subjected co-workers to offensive language, and her own behavior was erratic and angry); *Weinsheimer*, 754 F.Supp. at 1564 (conduct was

not unwelcome where plaintiff made sexual gestures, told sexual stories, and was otherwise willingly involved in sexual innuendo prevalent at work); *Perkins v. General Motors Corp.*, 709 F.Supp. 1487, 1497–98 (W.D.Mo.1989), *aff'd in part and rev'd in part sub nom., Perkins v. Spivey*, 911 F.2d 22 (8th Cir.1990), *cert. denied, Perkins v. General Motors Corp.*, 499 U.S. 920, 111 S.Ct. 1309, 113 L.Ed.2d 243 (1991) (men in shop made catcalls, touched plaintiff's breasts, made comments about plaintiff's "pussy," placed a hot dog in a condom on plaintiff's desk, made "humping" and masturbation motions in front of plaintiff, told sexual jokes, shook their genitals at each other and used profanity; no hostile work environment was found, however, since plaintiff encouraged the conduct by herself using shop talk, "goosing" men, and referring to their genitals as "pickles," and where, on the few occasions that she did complain, the conduct was dealt with appropriately). The Court will consider the "subjective perception" and "unwelcomeness" inquiries together.

 The Court finds that crude and vulgar behavior regularly occurred in the pressroom. The Court has no doubt that many of the incidents described by Balletti and Harrell actually occurred. Despite this evidence, however, Balletti has failed to establish her claim.

Balletti first apprised Sun–Sentinel management of the vaginal cream incident several weeks after it occurred in a casual hallway conversation with Sue Vonderheide. Although she claimed not to have been intimidated, Balletti expressed reluctance to be involved in an investigation and requested that the company not proceed with one. When Powers interviewed her about her complaint, she stated that she enjoyed her job and, with the exception of one co-worker, generally got along well with her co-employees. She acknowledged that gags were frequently played in the pressroom and that she joined in these pranks, such as altering clippings and placing them on the bulletin board. She revealed that, with the exception of the "C" word, the pressroom name-calling did not bother her and that she too used vulgarities in referring to her co-workers. But the

testimony of Barbara Carey and Scott Fatout make clear that Balletti's behavior went far beyond name calling and altered clippings. Notwithstanding that she apparently considered it a humorous prank, she physically assaulted a male co-worker by attempting to pull down and by actually ripping his pants. Furthermore, she openly discussed her use of a vibrator, bragged to her male co-workers that she "ate more pussy" than they did, and touted the pleasures of "fist fucking."

■ Against this backdrop, Balletti cannot be characterized as the victim of a sexually hostile environment. Her belated complaint about the harassment, her disapproval of the investigation, and her reported enjoyment of her job are not consistent with the conclusions she urges upon the Court. Moreover, she was among the most prevalent and graphic contributors to the pressroom environment. Her crude and vulgar behavior far exceeded any matters of which she complained. Her behavior here is fatal to her claims.[6] These are not the actions of an employee who subjectively perceives her work environment to be abusive or of one who seeks to convey to her co-workers that their behaviors are unwelcome.

■ Balletti also failed to establish the remaining element of her claim—that her employer knew or should have known of the harassment in question and failed to take prompt remedial action. The record is clear that when Balletti advised Vonderheide of the vaginal cream incident, Vonderheide immediately contacted her superiors. The company offered Balletti counseling, which she declined. Moreover, the company brought in an experienced labor attorney, John Powers, to investigate. He interviewed Balletti, who failed to provide him with names of suspects. Powers then spoke with Howard Parker, the person-in-charge of Balletti's crew, who disclaimed any knowledge of the incident. Powers took the results of his investigation to Malone. Although he could not identify the responsible party, and therefore could not recommend any disciplinary measures, Powers did recommend that the company implement sexual harassment training for each of its 1400 employees; and, in fact, the company adopted this recommendation. Following this investigation, Balletti did not again complain of harassment. The Court, therefore, concludes that the company's response in investigating the allegation was prompt and that its decision to implement sexual harassment training was reasonably calculated to address the problem that gave rise to the complaint. *See Carmon v. Lubrizol,* 17 F.3d 791 (5th Cir.1994) (employer took prompt remedial action by first transferring a co-worker to another shift in response to plaintiff's complaint that he made vulgar insults to her, and after a second incident issuing a memorandum to all employees reiterating its sexual harassment policy); *Steele v. Offshore Shipbuilding, Inc.,* 867 F.2d 1311, 1316 (11th Cir.1989) (court held that the employer was not liable for harassment where it did nothing more than verbally reprimand the alleged harasser); *Fred v. Wackenhut,* 860 F.Supp. 1401 (D.Neb.1994), *aff'd,* 53 F.3d 335 (8th Cir.1995) (no harassment found where employer responded to plaintiff's complaints by convening a meeting with plaintiff's co-workers to reiterate sexual harassment policy).

## B. *Retaliatory Discharge*

Balletti also alleges that she was terminated in retaliation for engaging in activity protected under Title VII.

■ Title 42 U.S.C. § 2000e—3(a) states in relevant part:

It shall be an unlawful employment practice for an employer to discriminate against any of his employees ... because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any

---

**6.** The Court does not hold that a plaintiff's mere participation in actions of a sexual or vulgar nature will completely bar a claim of sexual harassment. At some point, however, a plaintiff must show that she clearly made her co-workers aware that such conduct would be considered unwelcome. *Accord, Weinsheimer,* 754 F.Supp. at 1564 n. 12. This Balletti failed to do. Yet, even if her complaint to Vonderheide served to put her co-workers on notice, there is no evidence that any inappropriate behavior was thereafter directed to Balletti; and, Balletti did not again report any harassing behavior to management.

manner in any investigation, proceeding, or hearing under this subchapter.

Therefore, to establish a claim for retaliatory discharge, a plaintiff must show:

1) that she engaged in statutorily protected expression;

2) that she suffered an adverse employment action; and

3) that there is some causal connection between the two events.

*Meeks v. Computer Associates International* 15 F.3d 1013, 1021 (11th Cir.1994). Although not specifically enumerated as an element, a plaintiff must also show that the defendant was aware of the protected expression at the time it took the adverse employment action. *Goldsmith v. City of Atmore,* 996 F.2d 1155, 1163 (11th Cir.1993); *EEOC v. Carolina Freight Carriers Corp.,* 723 F.Supp. 734, 748 (S.D.Fla.1989). If a court finds the plaintiff has established a *prima facie* case, the burden shifts to the defendant to proffer a legitimate, non-discriminatory reason for the adverse employment action. *Meeks,* 15 F.3d at 1021. Once the defendant meets its burden of production, the plaintiff must then demonstrate that the defendant's proffered explanation was a pretext for retaliation. *Id.* The burden of persuasion, however, always remains with the plaintiff. *Id.*

■■■■ Balletti's June 1991 complaint of sexual harassment to Sun–Sentinel management constitutes protected activity; and, her termination in December 1991 was an adverse employment action. But Balletti must establish that her complaint caused her termination. She produced no direct evidence linking the two events. The causal connection, however, may be established circumstantially by showing a close time-link between the termination and the protected activity. *Balicao v. University of Minnesota,* 737 F.2d 747 (8th Cir.1984). The shorter the period between the two events, the stronger the inference that the adverse action was improperly motivated.

Balletti voiced her concerns of sexual harassment to Sue Vonderheide in June 1991; yet, she was not discharged until December 1991. During this intervening period, she continued to be employed at the Sun-Sentinel. Following by at least six months the internal company complaint, Balletti's discharge was not temporally close enough to support an inference of causal connection. *See Valdez v. Mercy Hospital,* 961 F.2d 1401, 1403 (8th Cir.1992) (no retaliation found where six months passed between protected activity and termination); *Juarez v. Ameritech Mobile Communications, Inc.,* 746 F.Supp. 798, 804 (N.D.Ill.1990) (six months between complaint and termination too remote); *Maldonado v. Metra,* 743 F.Supp 563, 568 (N.D.Ill.1990) (five month lapse between protected expression and termination too remote); *Reeves v. Digital Equipment Corp.,* 710 F.Supp. 675, 677 (N.D.Ohio 1989) (no retaliation where three months passed between protected expression and adverse employment action); *Brown v. A.S.D. Computing Center,* 519 F.Supp. 1096, 1116–17 (S.D.Ohio 1981) (discharge four months after protected activity too remote).

■■■ Yet, even if the discharge here supported an inference of retaliation, Balletti failed to prove by a preponderance of the evidence that the company's proffered reason for the termination—her refusal to take a requested drug test—was pretextual. Had the company decided to retaliate against Balletti for her complaining of harassment, it would logically have terminated her employment six months earlier; it did not. The company even issued Balletti a 3% merit pay increase in 1991. Although this was not as great as the 5% increase she received in 1990, it was within the range of increases she had received in her previous years with the company. Furthermore, following her complaint, Balletti received an evaluation stating that "she meets standards"; she had never received a higher rating. The company did issue Balletti a verbal warning during the intervening period; the warning resulted from her inserting a printing plate upside down. The same supervisor had previously cited thirty to forty employees for poor performance. His treatment of Balletti, therefore, was consistent with his treatment of employees who did not engage in any protected activity.

The Sun–Sentinel terminated Balletti only when she refused to take a requested drug test. The company's drug policy, a copy of which Balletti had received, provides for test-

**1550**

ing where management "reasonably suspect[s] that [an employee] is impaired, under the influence of drugs or alcohol, or exhibiting symptoms of potential recent drug or alcohol usage." The policy further provides that "[e]mployees who refuse to take a drug/alcohol test ... will be considered insubordinate and will be subject to disciplinary action up to and including termination."

In making the request of Balletti, the company acted upon reasonable suspicion and in good faith. Although Balletti protested that she was the only employee asked to take the test, no other employee had been implicated. The company had specific information from an employee who, without equivocation, reported that Balletti (alone) had been smoking marijuana inside the ladies bathroom. The reporting employee had no apparent animus toward Balletti and had never falsely accused a co-worker. Further, Balletti had a long history of drug abuse, and she was one of only two or three women on the pressroom day shift at the time of the incident. Her supervisors advised her of the consequences of declining to take the test, and yet she refused to accede to their request. Even after she was suspended, Balletti did not change her mind. To have permitted Balletti to continue her employment under these circumstances would have amounted to preferential treatment; all others who had refused a drug test had been terminated. By instead treating Balletti in the same manner as it had treated every other employee who had refused a requested test, the Sun–Sentinel acted appropriately.

### III. CONCLUSIONS

Kim Balletti failed to show that she was the victim of hostile work environment sexual harassment. She further failed to demonstrate that she was discharged in retaliation for engaging in statutorily protected activity. Accordingly, the Court will enter judgment in favor of defendant Sun–Sentinel Company.

DONE AND ORDERED.