Oswald S. RUSSELL, Plaintiff,

v.

AMERICAN EAGLE AIRLINES, INC., Defendant.

No. 98–377–Civ.

United States District Court,
S.D. Florida,
Miami Division.

April 21, 1999.

Stewart Leer Karlin, Fort Lauderdale, FL, for plaintiff.

Lisette Simone, Morgan Lewis & Bockius, Miami, FL, for defendant.

*ORDER*

K. MICHAEL MOORE, District Judge.

THIS CAUSE came before the Court upon Defendant's Motion for Summary Judgment (DE # 32). Response and Reply have been filed.

## I. Background

Plaintiff Oswald Russell was an aircraft mechanic employed by Defendant American Eagle Airlines, Inc.[1] Plaintiff, who is African–American, alleges that fellow employees and supervisors who were either white or Hispanic subjected him to various acts of racial discrimination during the period of his employment. Plaintiff filed suit against Defendant in February 1998, bringing claims under Title VII[2] and Section 1981.[3] Plaintiff's claims arise from three distinct classes of discriminatory acts, which the Court labels as those acts related to: (1) the crew chief demotion; (2) the cowling incident; and (3) hostile environment. The Court describes these classes of acts in turn.

## A. Crew Chief Demotion

The first category of acts pertains to Plaintiff's assignment and subsequent removal from a position as "crew chief," also known as "lead mechanic." In August 1993, Plaintiff applied for the position of crew chief. Plaintiff was rejected, even though he claims that these positions were given freely to white and Hispanic mechanics.[4] He only received the crew chief position after filing a union grievance.[5] After he received the crew chief position, Plaintiff states that in September 1993, he was forced to retake a maintenance course that he had previously failed, even though he had numerous licenses and experience.[6]

1. At the time of the alleged incidents, Plaintiff's employer was Flagship Airlines, Inc. American is Flagship's successor.

2. 42 U.S.C. § 2000e *et seq.*

3. 42 U.S.C. § 1981.

4. *See* Pl.'s Resp. to Def.'s Mot. for Summ.J. at 1–2.

5. *See id.* at 2.

6. *See id.*

Plaintiff was eventually removed from the crew chief position in December 1993 for "failure to meet the requirements for crew chief within the allotted time."[7]

Plaintiff filed a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC") in February 1994. This charge was addressed towards Plaintiff's demotion from the crew chief position.[8] Plaintiff received a right-to-sue notice in June 1996. However, Plaintiff did not file a civil suit for his demotion from the crew chief position within the statutory ninety-day filing period after receiving the notice.[9]

*B. Cowling Incident*

The second category of discrimination pertains to an incident in December 1996, in which an aircraft that Plaintiff had serviced lost its engine cowling in mid-flight and had to make an emergency landing. Defendant conducted an internal investigation into the incident, and determined that the cowling had come off because Plaintiff had failed to close certain fail-safe mechanisms on the cowling latches.[10] As a result of the determination that Plaintiff had been at fault in the cowling incident, as well as another incident in February 1996 involving the landing gear of another aircraft, Alberto Alvarez, a manager for Defendant, issued a so-called "Career Decision Day Advisory" ("the Advisory"). An Advisory is an internal disciplinary procedure for employees who have committed infractions that warrant dismissal.[11] The Advisory is part of Defendant's "Peak Performance through Commitment" policy, designed to "induce employees to committed service."[12] If an Advisory is issued to an employee, he is not automatically terminated. Instead, the employee can choose one of three options: (1) retain his position by signing a letter of commitment, in which the signor promises to correct any performance lapses; (2) resign from employment with severance pay; or (3) accept discharge with the right to file a grievance under the Collective Bargaining Agreement between Defendant and its employees.[13] Plaintiff chose the third option, and filed a grievance after discharge.

Plaintiff also filed a charge of discrimination with the EEOC in December 1996. In this second charge of discrimination, Plaintiff claimed racial discrimination and retaliation as the bases of his dismissal pursuant to the cowling incident and the Advisory.[14] Plaintiff received a right-to-sue notice in November 1997, and filed the present action in February 1998. While this present action was pending, a neutral arbitrator was appointed in October 1998 under the grievance settlement procedure. The arbitrator conducted an evidentiary hearing. Plaintiff was represented by counsel. The arbitrator issued a report in December 1998 specifically finding that the engine cowling had fallen off the aircraft due to "human error" on the part of Plaintiff.[15] The arbitrator further held that Plaintiff could still obtain reinstatement to his position if he signed the letter of commitment originally offered to him in December 1996. It appears that Plaintiff

---

**7.** *See* Crew Chief Letter dated December 6, 1993, App. to Def.'s Mot. for Summ.J. Tab A, Ex. 50.

**8.** *See* EEOC Discrimination Charge dated Feb. 23, 1994, App. to Def.'s Mot. for Summ.J. Tab A, Ex. 35.

**9.** *See* Dep. of Oswald Russell at 168–69, 251–53, App. to Def.'s Mot. for Summ.J. Tab A (hereinafter "Russell Dep.").

**10.** *See* AMR Inquiry Report dated December 6, 1996, App. to Def.'s Mot. for Summ.J. Tab A, Ex. 33.

**11.** *See* Decl. of Colleen Scanlon at 1–2, App. to Def.'s Mot. for Summ.J. Tab C.

**12.** *Id.* at 1.

**13.** *See id.* at 2.

**14.** *See* EEOC Discrimination Charge dated December 6, 1996, App. to Def.'s Mot. for Summ.J. Tab A, Ex. 1.

**15.** Arbitral Award at 8, App. to Def.'s Mot. for Summ.J. Tab A, Ex. 41.

subsequently signed the letter in February 1999 and has since returned to work.

## C. Hostile Environment

 In addition to the two discrete acts of demotion and dismissal, Plaintiff also alleges that there has been a continuing pattern of racially offensive acts committed against him by white and Hispanic co-workers. While not all of these alleged acts are racial in character, and few have evidentiary support, the following are the more notable incidents:

(1) Someone wrote the words "Asshole nigger, asshole nigger lead" on a blackboard outside the crew chiefs' office.[16]

(2) A crew chief checked Plaintiff's bag for a misplaced tool. Plaintiff was the only African–American on that shift, and no other mechanics were checked. The tool was later located.[17]

(3) Co-workers told racial jokes and drew cartoons on the blackboard in the crew chiefs' office,[18] as well as putting up a stuffed animal with Plaintiff's name and a rope around its neck.[19]

(4) During a so-called "racial hour," workers would get together at the end of the night shift to tell racially offensive jokes and make derogatory comments about racial minorities.[20]

(5) Someone hung a noose from the mechanics' trailer with the words "To Hang Dobson," referring to another African–American mechanic.[21]

(6) Someone posted a Polaroid picture of a black background with two "smiley faces" drawn with white correction fluid. The picture contained the caption: "In the ramp at 10:00 P.M., Dobson and Ozzy," referring to Plaintiff and another African–American mechanic.[22] Defendant now moves for summary judgment. Response and Reply have been filed.

## II. Summary Judgment Standard

As an initial matter, the Court notes that under Rule 56(c) of the Federal Rules of Civil Procedure:

> The judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.[23]

Summary judgment may be entered only where there is no genuine issue of material fact.[24] The moving party has the burden of meeting this exacting standard.[25] In applying this standard, the district court must view the evidence and all factual inferences therefrom in the light most favorable to the party opposing the motion.[26]

However, the non-moving party "[m]ay not rest upon the mere allegations and denials of [its] pleading, but [its] response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial."[27] "The mere existence of a scintilla of evidence in support of the [non-movant's] position will be insufficient; there must be evidence on which the jury could

16. Pl.'s Resp. to Def.'s Mot. for Summ.J. at 3.

17. See id.

18. See id. at 4.

19. See Russell Dep. at 114.

20. See id. at 120, 133.

21. See Pl.'s Resp. to Def.'s Mot. for Summ.J. at 7.

22. See id.

23. Fed.R.Civ.P. 56(c).

24. See Twiss v. Kury, 25 F.3d 1551 (11th Cir.1994).

25. See Adickes v. S.H. Kress & Co., 398 U.S. 144, 157, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970).

26. See id.

27. Fed.R.Civ.P. 56(e).

reasonably find for the [non-movant]." [28] The party opposing summary judgment "must do more than simply show that there is some metaphysical doubt as to the material facts." [29] In fact,

> the plain language of Rule 56(c) mandates the entry of summary judgment ... against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.[30]

The failure of proof concerning an essential element of the non-moving party's case necessarily renders all other facts immaterial and requires the court to grant the motion for summary judgment.[31]

## III. Discussion

In its Motion, Defendant seeks summary judgment on the grounds that: (1) Plaintiff's claims are time-barred; (2) Plaintiff's negligent role in the cowling incident was a legitimate, non-discriminatory reason for issuing the Advisory; (3) there is no causal link between Plaintiff's filing of an EEOC charge in 1994 and the issuance of the Advisory in 1996, and (4) Plaintiff never reported any racially hostile actions to Defendant's management through established grievance procedures. The Court addresses these arguments in turn.

### A. Time Bar

The Court finds that it must grant summary judgment as to that element of Plaintiff's Complaint based on Plaintiff's demotion from the crew chief position in 1993. It is undisputed that Plaintiff received an EEOC right-to-sue notice in June 1996. It is also undisputed that Plaintiff was aware of the ninety-day period in which to file a civil suit based on that right-to-sue notice, and did not in fact file suit within that period.[32] Failure to file a suit on the alleged discriminatory acts within the ninety-day period is grounds for dismissal of that action.[33]

In addition, Plaintiff's demotion occurred in December 1993, but the Complaint was not filed until February 1998. It is therefore also time-barred under Section 1981, which borrows Florida's four-year statute of limitations for personal injury actions.[34]

### B. Legitimate, Non–Discriminatory Rationale for Issuing the Advisory

In addition to his claim for demotion from the crew chief position, Plaintiff also claims that Defendant's issuance of the Advisory in 1996 was based on an intent to discriminate on the basis of race. As an initial matter, the Court notes that there is no direct evidence that Defendant's issuance of the Advisory was racially motivated. Plaintiff states that "[i]t's possible," that his race played a role in the decision, but admits that "[he] do[es]n't know." [35] Where there is no direct evidence of discriminatory intent, Title VII discharge/disparate treatment claims undergo a three-part analysis. First, a plaintiff bears the burden of establishing a prima facie case, i.e., the establishment of a legally mandatory, rebuttable presumption, rather than simply putting forth enough evidence to permit a trier of fact to infer the fact at

---

28. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 252, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

29. *Matsushita Elec. Indus. Co. v. Zenith Radio,* 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

30. *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

31. *See id.*

32. *See* Russell Dep. at 251–53.

33. *See* 42 U.S.C. § 2000e–5(f)(1); *see, e.g., Norris v. Florida Dept. of Health & Rehabilitative Servs.,* 730 F.2d 682 (11th Cir.1984).

34. *See Baker v. Gulf & Western Indus., Inc.,* 850 F.2d 1480, 1483 (11th Cir.1988).

35. Russell Dep. at 296.

issue.[36] This generally involves meeting the four-part test articulated by the Supreme Court in *McDonnell Douglas Corp. v. Green.*[37] In order to establish a prima-facie case under *McDonnell Douglas*, a plaintiff must show that: (i) he is a member of protected minority; (ii) he was qualified; (iii) he was subjected to an adverse employment action; and (iv) the defendant treated similarly situated employees outside the class more favorably.[38] The burden then shifts to the defendant to produce a legitimate, non-discriminatory explanation for the adverse action.[39] If defendant can do so, the burden then shifts back to the plaintiff to rebut defendant's explanations;[40] ultimately, the plaintiff bears the burden of carrying his case.[41]

The Court finds that it must grant summary judgment against Plaintiff. Assuming, *arguendo*, that there is enough evidence to support a prima facie case,[42] Defendant has presented a well-supported legitimate, non-discriminatory rationale for issuing the Advisory. In response, Plaintiff has not advanced sufficient evidence to create a material issue of fact as to whether Defendant's legitimate, non-discriminatory rationale for issuing the Advisory is pretextual.

Defendant's legitimate, non-discriminatory explanation for why Plaintiff was is-sued the Advisory is that Plaintiff failed to properly secure an engine cowling on an aircraft he serviced, and as a result of that failure, the engine cowling came off in mid-flight, forcing the aircraft to make an emergency landing. This rationale is amply supported by the evidence. Defendant's management conducted an internal investigation and concluded that the incident was the result of Plaintiff's failure to engage certain fail-safe mechanisms on the cowling latches.[43] Specifically, the investigators found that "[t]he chain of events leads to the conclusion of the [Plaintiff] closing cowling door, pushing latches (both) to the closed position, *but not fully engaging the fail safe mechanism of the latch.*"[44] The conclusions of the internal investigation were subsequently affirmed by the neutral arbitrator in December 1998. After hearing the parties' presentation of evidence and arguments, the arbitrator found that "the most probable cause of the opening of the cowling hood was human error on part of grievant."[45] While neither the results of the internal investigation nor the findings of the arbitrator have any dispositive effect on this Court's consideration of the evidence, the Court accords them substantial weight, especially in light of the fact that Plaintiff has not intimated that the arbitrator was anything but neutral and competent.[46]

**36.** *See Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248, 253, 254 n. 7, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981); *Evans v. McClain of Georgia, Inc.*, 131 F.3d 957, 963 (11th Cir.1997).

**37.** 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973).

**38.** *See id.; Combs v. Plantation Patterns*, 106 F.3d 1519, 1539 n. 11 (11th Cir.1997).

**39.** *See Burdine*, 450 U.S. at 253, 101 S.Ct. 1089; *Evans*, 131 F.3d at 963.

**40.** *See Burdine*, 450 U.S. at 253, 101 S.Ct. 1089; *Evans*, 131 F.3d at 964–65.

**41.** *See Burdine*, 450 U.S. at 253, 101 S.Ct. 1089; *Evans*, 131 F.3d at 963.

**42.** At the very least, Plaintiff can meet the first three conditions: (1) As an African-American, Plaintiff is a member of a protected minority; (2) Plaintiff was qualified to do his job; and (3) the Advisory was an adverse employment action. However, as discussed more fully *infra*, there is some dispute as to whether similarly situated non–African–American employees were treated more favorably.

**43.** *See* AMR Inquiry Report dated December 6, 1996, App. to Def.'s Mot. for Summ.J. Tab A, Ex. 33.

**44.** *Id.*

**45.** Arbitral Award at 8, App. to Def.'s Mot. for Summ.J. Tab A, Ex. 41.

**46.** The findings of an arbitration proceeding can be highly probative, and federal courts should weigh the probity of such findings based on: (1) the degree of procedural fair-

"A satisfactory explanation by the defendant destroys the legally mandatory inference of discrimination arising from the plaintiff's initial evidence." [47] Plaintiff must, at this point, reestablish the validity of his prima facie case through rebuttal evidence. [48] In order to properly rebut a defendant's legitimate, non-discriminatory rationale, a plaintiff "may not ... merely rest on the laurels of her prima facie case in the face of powerful justification evidence offered by the defendant." [49] Against the weight of the evidence that appears to show that Defendant issued the Advisory because of Plaintiff's failure to properly secure the cowling latch, which forced a passenger airplane to make an emergency landing, Plaintiff offers three lines of argument, all notably lacking in evidentiary support.

First, Plaintiff appears to attack the validity of the conclusions of the internal investigation and the arbitrator. He claims that he closed the cowling latches, and as the detached cowling was never found, the Court should disregard the findings of both the internal investigators and the neutral arbitrator and instead embrace another explanation, i.e., that the cowling fell off for some other, unspecified mechanical reason. Aside from his protestations of innocence, Plaintiff offers absolutely no evidence to show that there was in fact another explanation for the incident. This is clearly inadequate to rebut the conclusion that as a factual matter, the cowling fell off due to Plaintiff's maintenance failure. [50]

Secondly, Plaintiff seems to suggest that the engine cowling may have fallen off due to the work of unnamed saboteurs. He claims, without evidence other than his own statements to the effect, that in late 1993, someone let the air out of the tires on an aircraft for which Plaintiff was responsible. [51] He further claims that in 1994, someone removed a seat belt that Plaintiff had installed. [52] Finally, Plaintiff claims that in late 1994, Plaintiff saw another mechanic "interfering" with a beacon light on a plane for which Plaintiff was responsible, and that this mechanic had been "around" during previous acts of sabotage. [53] If Plaintiff is suggesting that co-workers sabotaged aircraft and endangered passengers' lives to lay the blame on

---

ness in the arbitral forum; (2) the adequacy of the record; and (3) the competence of the arbitrator. *See Graef v. Chemical Leaman Corp.*, 106 F.3d 112, 117 (5th Cir.1997).

**47.** *Burdine*, 450 U.S. at 255–56 n. 10, 101 S.Ct. 1089.

**48.** *See id.; Evans*, 131 F.3d at 964–65.

**49.** *Grigsby v. Reynolds Metals Co.*, 821 F.2d 590, 596 (11th Cir.1987).

**50.** While Plaintiff has failed to discuss a legal framework for assessing his argument that the engine cowling detached for other reasons, the doctrine of res ipsa loquitur compels the inference that Plaintiff's negligence caused the accident. Under this doctrine, it is possible to infer negligence if: (1) the instrumentality involved was within the exclusive control of the defendant at the time of the injury; and (2) the injury is one which would not ordinarily occur in the absence of negligence. *See Burns v. Otis Elevator Co.*, 550 So.2d 21, 22 (Fla.Dist.Ct.App.1989). It seems fair to say that engine cowlings do not normally come off in mid-flight, absent some sort of negligence. In addition, it appears that Plaintiff was in exclusive control of the engine cowling, having been the last person to close the cowling while the plane was taxing on the runway. This leads the Court to believe that the evidence overwhelmingly supports the inference that Plaintiff was responsible for the cowling incident. In reply, Plaintiff claims that the cowling came off "because a nut, washers and cotter pin were never installed by the mechanic that conducted the original installation." *See* Pl.'s Resp. to Def.'s Mot. for Summ.J. at 6–7. However, Plaintiff again fails to provide any evidence to support his statements. Plaintiff cannot rely on such unsubstantiated speculation about other possible explanations to defeat the inference of negligence. *See McDougald v. Perry*, 716 So.2d 783, 786 (Fla.1998).

**51.** *See* Pl.'s Resp. to Def.'s Mot. for Summ.J. at 4.

**52.** *See id.*

**53.** *See id.* at 4–5.

him for the accidents that might result, he needs more and better evidence than this specious conspiracy theory.

Plaintiff's final line of rebuttal is that even if he was responsible for the cowling incident, Defendant's response must have been racially motivated because other non–African–American mechanics were never disciplined as harshly for similarly negligent repairs or maintenance. Plaintiff claims that there were numerous incidents, including: (1) In 1993, a mechanic named Felix Sorda damaged the engines on an aircraft that caused "$100,000's of thousands of dollars," and grounded the aircraft for three days.[54] (2) In 1995, a mechanic named Larry Sheet caused damage to an aircraft resulting in "thousands of dollars" in damage, but was never reprimanded.[55] (3) In 1997, three white mechanics negligently damaged an aircraft resulting in "$1 million in damage." While they were not disciplined, their African–American supervisor was suspended.[56] (4) In 1998, an aircraft lost an engine exhaust covering in mid-flight. The white mechanic "responsible for this incident" was never disciplined.[57] (5) In 1999, an aircraft had to make an emergency landing because its engine cowling was "partially torn open." Plaintiff states that the two Hispanic mechanics who had serviced the aircraft were never disciplined, even though this was "similar" to the incident for which Plaintiff was disciplined.[58]

The Court finds that this last line of rebuttal must also be rejected. Plaintiff has not submitted any evidence to support these contentions aside from his own statements that such events occurred.[59] There is no way to know where Plaintiff is getting such information, or to assess the validity of his conclusions regarding fault, circumstances, or amount of damage. There is absolutely, and inexplicably, no evidence from any other source, such as company records or other witnesses, to corroborate Plaintiff's statements. Without such evidence, the Court cannot begin to determine whether these other incidents were suitably "similar" to the cowling incident[60] to raise an inference of discriminatory intent behind the issuance of the Advisory.

In the near-total absence of evidence to rebut Defendant's legitimate, non-discriminatory rationale for disciplining Plaintiff, the Court holds that summary judgment must be granted against Plaintiff on his Title VII claim arising from the issuance of the Advisory. Furthermore, the Court holds that summary judgment must be granted against Plaintiff to the extent that his claims also arise out of Section 1981.[61]

## C. Causality

█ Plaintiff also claims that the Advisory was issued in retaliation for his filing of his first EEOC charge in 1994. Title VII retaliation claims undergo an analysis similar to the one for disparate treatment claims. A plaintiff must establish a prima facie case; he must show that: (1) he was engaged in a protected activity; (2) there was an adverse employment action; and (3) there was a causal connection between the protected activity and the resultant

---

54. *Id.* at 5.

55. *Id.*

56. *Id.* at 6.

57. *Id.*

58. *Id.*

59. *See* Pl.'s Aff. ¶¶ 33–34, 39–42.

60. *See Holifield v. Reno*, 115 F.3d 1555, 1562 (11th Cir.1997) (requiring plaintiff to show existence of other "similarly situated" employees in a disparate treatment claim).

61. The*McDonnell Douglas* framework for proving intentional race discrimination in the Title VII context is applicable to Section 1981 claims. *See Patterson v. McLean Credit Union*, 491 U.S. 164, 185–87, 109 S.Ct. 2363, 105 L.Ed.2d 132 (1989); *Robertson v. Home Depot, Inc.*, 976 F.Supp. 1467, 1477 n. 9 (S.D.Fla.1997).

**1338**

adverse action.[62] The Court finds that it must grant summary judgement against Plaintiff's retaliation claim because there is no evidence to create a material issue of fact as to the causal connection between the filing of the EEOC charge and the issuance of the Advisory.

It is undisputed that the Advisory was issued in December 1996, nearly three years after the filing of the first EEOC discrimination charge in February 1994. Such a long time interval between the EEOC discrimination charge and the alleged act of retaliation,[63] coupled with the fact that there is no evidence of causality between the two events, leads this Court to conclude that Plaintiff has failed to establish a prima facie case of retaliation.

### D. Hostile Environment

The Court finds that there is sufficient evidence in the deposition testimony of co-workers to create a material issue of fact as to whether Plaintiff was subjected to a racially hostile work environment. These incidents—of which the hanging of a noose is particularly appalling—have absolutely no place in our society, and there can be no doubt that such incidents would create a "working environment[ ] so heavily polluted with discrimination as to destroy completely the emotional and psychological stability of minority group workers."[64]

■ However, as deplorable as these incidents are, the Court finds that it must grant summary judgment against Plaintiff on his claim for hostile environment. Plaintiff has failed to present any evidence to create a material issue of fact as to Defendant's affirmative defense under *Faragher v. City of Boca Raton.*[65] The *Faragher* defense states that an employer cannot be held vicariously liable for a hostile environment created by co-workers if two conditions are met: (1) the employer exercised reasonable care to prevent and correct promptly any harassing behavior; and (2) the plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise.[66]

■ Defendant has met both conditions of the *Faragher* defense. The promulgation of an anti-harassment policy with a complaint procedure is generally sufficient to address the first prong of the defense.[67] Defendant has submitted evidence to show that it has an internal grievance procedure, outlined in its Employee Handbook. The Handbook states that "American Eagle maintains a workplace which is free from discrimination or harassment.... Reports of sexual or any other form of harassment should be reported immediately to the Personnel Director."[68] In addition, there is evidence that the policy was sufficiently disseminated to the employees, and that Plaintiff knew about Defendant's internal grievance procedure. Plaintiff

---

**62.** See *Meeks v. Computer Assocs. Int'l,* 15 F.3d 1013, 1021 (11th Cir.1994).

**63.** See, e.g., *Balletti v. Sun–Sentinel Co.,* 909 F.Supp. 1539 (S.D.Fla.1995) (finding a lack of causality where there is a significant length of time between the protected activity and the alleged act of retaliation).

**64.** *Meritor Sav. Bank v. Vinson,* 477 U.S. 57, 66, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986). The Court notes that Defendant does not deny that the "hanging rope" incident occurred, but merely that it was directed at another employee. See Def.'s Reply at 6.

**65.** 524 U.S. 775, 118 S.Ct. 2275, 141 L.Ed.2d 662 (1998).

**66.** See *id.* at 2292. A third, implicit condition is that the hostile environment did not involve a tangible employment action. See *id.* The Court finds that this third condition is also satisfied because there is no evidence that the tangible employment actions in this case, the crew chief demotion and the Advisory, were related to the incidents creating the hostile environment.

**67.** See *id.* at 2293.

**68.** Employee Handbook § 3 at 2, App. to Def.'s Mot. for Summ.J. Tab A, Ex. 7.

signed the Employee Handbook Notice.[69] Furthermore, Plaintiff stated in his deposition that "there was a policy with regard to harassment,"[70] and that he was aware of such a policy, possibly as early as 1994.[71]

The second prong of the *Faragher* defense is satisfied because there is no evidence—aside from his own nonspecific allegations—to show that Plaintiff ever brought the incidents that allegedly created the hostile environment to the attention of Defendant through those internal procedures.[72] Plaintiff states that he went repeatedly to management and "nothing happened."[73] However, Plaintiff has not pointed to any corroborating evidence to show that he in fact filed complaints with management and that no action was taken. Unable to support his claims that he went to management to complain about the racially hostile incidents, Plaintiff offers up the explanation that he "knew management was not going to do anything about it,"[74] and he had "given up on management."[75]

To the contrary, the evidence that is available suggests that Plaintiff never raised these racially hostile incidents even in the face of ample opportunities to do so. Neither the February 1994 nor the December 1996 EEOC discrimination charges mention any of the racially hostile incidents. At one point, Defendant invited Plaintiff come to Nashville, Tennessee to participate in its investigation of Plaintiff's 1994 EEOC charge regarding his crew chief demotion. There is no evidence that shows that Plaintiff took advantage of this opportunity to raise these incidents with Defendant's investigators. Instead, it appears that the investigation only dealt with the crew chief demotion itself. It appears that Defendant again invited Plaintiff to participate in a follow-up investigation into the crew chief demotion in January 1995. According to his deposition, Plaintiff refused to attend this second investigation, based on his opinion that Defendant was taking too long with its investigations and that the whole process was "disingenuous."[76]

While the Court is certainly sympathetic to Plaintiff's claim that his co-workers created a racially hostile environment, its hands are bound if Plaintiff cannot demonstrate that he first attempted to resolve the situation through Defendant's internal complaint procedures. For this reason, the Court must grant summary judgment against Plaintiff on his claim for hostile environment.[77]

*IV.* *Conclusion*

Based on the foregoing, it is ORDERED AND ADJUDGED that Defendant's Motion for Summary Judgment (filed February 25, 1999, DE # 32) be, and the same is hereby, GRANTED.

DONE AND ORDERED.

---

69. Employee Handbook Notice, App. to Def.'s Mot. for Summ.J. Tab A, Ex. 6.

70. Russell Dep. at 53.

71. *See id.* at 54.

72. *See id.* at 116 (Plaintiff stating that he never brought the incidents to the attention of Human Resources).

73. *Id.* at 98.

74. *Id.* at 112.

75. *Id.* at 115.

76. *See id.* at 276–77.

77. In no way should Defendant read this Order as a carte blanche to indulge in any complacency regarding the racial environment at its facilities. To the extent that Defendant now has clear notice that employees at its facilities may very possibly have engaged in racially offensive acts in the past, it should make sure that such behavior is completely eradicated and does not reoccur in the future.